**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**NATIONAL BANKERS LIFE INSURANCE COMPANY et al., Defendants.**

**Civ. A. No. 3–4432–B.**

United States District Court,
N. D. Texas,
Dallas Division.

Nov. 18, 1971.

Robert Watson, Steve Watson, John High, James Sims, Lawrence Kiser, for plaintiff—Securities and Exchange Comm.

Morton Susman, Houston, Tex., for Frank Sharp, Sharpstown Realty, Oak Forest Realty, Oak Forest Investment and Master Control.

Henry Strasburger and Fred Newberry, Dallas, Tex., for National Bankers Life and Olympic Life.

Frank Skillern, Dallas, Tex., for Sharpstown State Bank.

Louis Weber, Dallas, Tex., for NBL Plan.

Tim Timmins, Dallas, Tex., for J. Quincy Adams.

James Day and Gerald Waters, Dallas, Tex., for Audy Byram.

Charles Storey and Paul Adams, Jr., Dallas, Tex., for Waggoner Carr.

A. Don Crowder, Dallas, Tex., for James Farha.

Robert Cady, Dallas, Tex., for David Hoover.

Robert Jones, Dallas, Tex., for John Osorio.

Lewis Chandler, Dallas, Tex., for Phillip Proctor.

Gene Gardner, Lawton, Okl., for South Atlantic.

John Spinuzzi, Dallas, Tex., for Tom Thomas.

## AMENDED JUDGMENT

HUGHES, District Judge.

The Securities and Exchange Commission filed this civil action to enjoin 13 corporations and 15 individuals from distributing unregistered securities and engaging in fraudulent and manipulative practices in connection with the sale of securities.[1] Before rendering the judgment, nine of the defendants had agreed to permanent injunctions and the SEC had dismissed five defendants without prejudice to refiling. The following defendants contested the issuance of an injunction: J. Quincy Adams, Audy Byram, Waggoner Carr, James Farha, David Hoover, John Osorio, Phillip Proc-

tor, Tom Max Thomas, and South Atlantic Company [SAC]. Nashwood Corporation was in default. The following defendants did not actively contest the allegations of the complaint: Frank W. Sharp, Sharpstown Realty Co., Oak Forest Realty Co., and Oak Forest Investment Co.

This case considers multipartite dealings in the securities of National Bankers Life Insurance Company [NBL], Olympic Life Insurance Company, Master Control [MCI], RIC International Industries [RIC] and South Atlantic Company. The individual and collective effect of these transactions was the distribution of unregistered securities and the manipulation of their price in the over-the-counter market. The defendants accomplished these distributions of the unregistered securities by pledging the stock in their controlled companies at banks under their control and at other banks. In many instances the defendants obtained the funds for the purchase of the securities from one of the controlled banks. The defendants accomplished the manipulation of the stock of NBL, Olympic, and MCI by causing selective purchases calculated to decrease the "floating" supply with the market maker, Ling & Co., resulting in a corresponding rise in the value of the stocks. The defendants or the companies under their control made many of these purchases.

The central architect of the scheme to distribute and to manipulate the securities was Frank Sharp. The other defendants either worked with Sharp or for Sharp controlled entities or involved themselves in collateral activities related to the Sharp financial empire.

Sharp controlled Sharpstown Realty Company, Sharpstown State Bank, Oak Forest Realty, Oak Forest Investment Co., National Bankers Life, Olympic Life, and Master Control. Sharp exercised his control over the banking and

---

1. This Court had earlier entered a preliminary injunction against all but one of the named defendants. Securities & Exch. Comm'n v. National Bankers Life Ins. Co., 324 F.Supp. 189 (N.D.Tex.1971), aff'd, 448 F.2d 652 (5th Cir., 1971).

insurance companies through Joseph Novotny and John Osorio. John Osorio was the president of NBL during the violations. Osorio with Waggoner Carr and Tom Thomas, who were all associated in the practice of law, exercised control over Dallas Bank & Trust, City Bank & Trust, Nashwood Corporation, and South Atlantic Co., which controlled RIC. Audy Byram was president of RIC during the violations. In an effort to secure capital for their companies and to support the market for their securities, certain of the defendants employed David Hoover in a scheme to pledge shares of RIC at numerous banks. The securities manipulations were accomplished through transactions at Ling & Co. J. Quincy Adams, an officer with Ling & Co., and director of City Bank & Trust, directed the market manipulation. In addition, Adams worked with Jim Farha and Phillip Proctor, representatives of Ling & Co., in promoting the manipulations.

The following is background and a brief outline of some of the more significant developments which were part of the overall scheme to violate the securities laws.

### The Development of the Sharp Financial Empire.

In June of 1968 Sharp acquired control of Olympic Life Insurance Co. In July of 1968 Sharp acquired control of National Bankers Life. Sharp financed these acquisitions by securing loans from captive banks and then pledging the acquired stock as collateral. He would use the assets of the acquired companies to pay off the notes at the banks and thereby acquire the companies with their own assets. In addition, Sharp utilized the Jesuit Fathers of Houston, a non-profit corporation, as a source of funds. Sharp appropriated the Jesuit's financial resources and used them to build his empire. Sharp caused the Fathers to make large purchases of NBL stock at prices

over the present market price to facilitate the manipulation of the stock and to cover certain aborted dealings. After assuming the control of the insurance companies and through Sharpstown Bank, Sharp funded numerous securities purchases and corporate acquisitions made by the defendants and their controlled companies.

### South Atlantic Company and RIC International Industries Transactions

John Osorio and Waggoner Carr purchased control of South Atlantic Company which held as its principal asset control of RIC. Osorio and Carr financed the acquisition with a loan for $550,000 from City Bank & Trust with the SAC stock acting as collateral. Later they transferred the loan to Exchange Bank. Carr signed the note and the bank demanded additional guarantee which Osorio supplied personally and in the form of a take out commitment by NBL. Eventually NBL purchased the note after Exchange Bank kept demanding additional security and payment. During the time Carr and Osorio had the SAC stock pledged for their purchase loan, the stock of RIC, SAC's principal asset, was also pledged as collateral for loans at Bank of Louisville. In addition, the prior owner of SAC had a second lien on the stock.

In the spring of 1970, the defendant companies were in need of capital in order to sustain their business operations and the market. To secure the capital, the defendants arranged a scheme whereby they would pledge the unregistered shares of RIC owned by SAC through David Hoover. At this time Bank of Louisville held the 1,040,000 shares of RIC as collateral. To "free up" these shares, the defendants directed NBL to purchase control of Loyal American Life Insurance Company from Globe Capital Corporation. NBL financed the purchase of Loyal American at Bank of Louisville with the support of Sharpstown Bank.[2] NBL's purchase of Loyal

---

2. Sharpstown Bank supported the financing by depositing a $3 million compensation balance at Bank of Louisville. The

purchase impaired NBL's capital position and eleven months later NBL sold Loyal American at a loss.

American from Globe provided Globe with sufficient resources to pay an outstanding obligation to RIC. With these proceeds SAC paid off the RIC note at the Bank of Louisville and redeemed its 1,041,000 shares of RIC freeing them for further pledging.

The defendants then arranged for Hoover to pick up the RIC stock in Louisville and to bring it to Texas where he pledged the stock at numerous Texas banks.

## Nashwood Corporation Transactions

Osorio, Carr, Thomas, and other defendants controlled Nashwood Corporation. Nashwood purchased control of West Virginia Life Insurance Company by borrowing $1,125,000 from Sharpstown Bank and pledging 30,000 shares of West Virginia Life stock. Later Nashwood and NBL merged West Virginia Life into NBL and Nashwood received 66,666 NBL shares which it substituted as collateral for its note at Sharpstown Bank.

In addition, Nashwood engaged in numerous purchases and sales of stock of the subject companies all of which furthered the manipulation of market price of the securities.

Throughout the period of the violations, the defendants made numerous securities transactions in which they arranged financing at institutions under their control and used the institutions to bail them out when the transactions became unsupportable. They repeatedly shifted assets of these companies, consolidated and transferred personal loans among the controlled entities, and converted the corporation assets for their personal gain. The transactions established by the evidence are replete with self dealing. Besides the fraudulent acts in dealing with these public companies, certain of the defendants attempted to influence State and federal officials in furtherance of their scheme.

## Findings of Fact

A. This Court has jurisdiction of this action under Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a) (1970), and Section 21(f) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(f) (1970).

B. In connection with the transactions which are the subject of this action, the defendants made use of the instrumentalities of interstate commerce or of the mails.

C. At all times pertinent to the transactions which are the subject of this action, the defendants knew or in the exercise of ordinary care should have known that their acts tended to further the distribution of unregistered securities and the manipulation of these securities.

D. None of the transactions in the securities of National Bankers Life Insurance Company [NBL], Olympic Life Insurance Company [OLI], Master Control, Inc. [MCI] and RIC International Industries, Inc. [RIC] hereafter referred to involving defendants Frank W. Sharp [Sharp], Sharpstown Realty Company [SRC], Oak Forest Investment Company [OFIC], John Osorio [Osorio], Tom Max Thomas [Thomas], Waggoner Carr [Carr], John Quincy Adams [Adams], David Hoover [Hoover], Audy Byram [Byram], Phillip M. Proctor [Proctor], South Atlantic Company [SAC], James Farha [Farha] and Nashwood Corporation [Nashwood] was the subject of an effective registration statement pursuant to the provisions of the Securities Act of 1933, as amended, (15 U.S.C. 77e(a) and (c) ("Securities Act"), prior to or at the time of such transactions.

E. At the time any of the defendants named in paragraph D pledged the securities of NBL, OLI, MCI and RIC as collateral for loans, there was no reasonable likelihood that the defendants pledging the stock or causing it to be pledged could pay off the loans collateralized by such stock.

F. At all times pertinent hereto NBL, MCI, OLI, RIC and SAC were publicly held companies.

G. *Frank W. Sharp.*

1. At all times pertinent hereto, defendant Sharp was the chief executive officer and controlling shareholder of defendants SRC and OFIC. SRC was the controlling shareholder of NBL, SSB and MCI. Sharp was chairman of the Board of Sharpstown State Bank [SSB] and NBL.

2. At all times pertinent hereto Sharp exercised control over OLI through ownership of controlling stock in that Company by W. D. Haden, II, Sharp's son-in-law, which ownership was financed by SSB.

3. Between January 1, 1968 and January 18, 1971, Sharp personally pledged approximately 20,000 shares of NBL stock as collateral for loans at DB&T and CB&T. Subsequent to pledging this stock, Sharp directed DB&T and CB&T to sell the stock for the purpose of paying Sharp's indebtedness and to remit the balance of the sales price, over and above the amount of the indebtedness, to Sharp.

4. During the period January 1, 1968 through January 18, 1971 Sharp, acting through W. D. Haden II, pledged a total of approximately 1,625,000 shares of OLI at SSB and approximately 100,000 shares of NBL at SSB.

5. During the period January 1, 1968 through January 18, 1971 defendant Sharp, directly and through defendant Osorio and others, attempted to obtain passage of legislation, concerning insurance of deposits in state banks by a state chartered insurance company, by causing stock of NBL to be sold to certain State officials in the legislative and executive branches and by causing SSB to finance purchases of NBL stock by those persons.

6. During the period January 1, 1968 up to and including January 18, 1971 Sharp participated in and employed a device, scheme and artifice to defraud for the purpose of manipulating the market in the common stock of NBL, OLI and MCI, by directly and through Osorio, Adams, Farha, and Proctor causing Ling & Co., a registered broker-dealer, to make a market in the stocks of these companies, by financing purchases of these stocks through SSB, CB&T, DB&T, NBL and National Bankers Life Insurance Company Employees Retirement Plan [NBL Plan] for the purpose of decreasing the amount of these securities available in the market resulting in a corresponding increase in the market price, and by issuing false and misleading press releases and financial statements concerning the operations of these companies and their proposed mergers and acquisitions.

7. In connection with the sales and pledges of NBL, OLI and MCI stock referred to in subparagraphs 3, 4 and 5 above, and in connection with the manipulation of the market price of these stocks referred to in subparagraph 6 above, Sharp, directly and through other defendants, made misrepresentations of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading and concerning, but not limited to:

a) The fact that the price at which these securities were being offered was an artificially created price.

b) The fact that the controlling stock of these companies had been acquired by Sharp primarily through loans made to him by these companies.

c) The fact that with respect to NBL there were large loans receivable from Sharp and other defendants concerning which there was little likelihood of repayment.

d) The fact that with respect to NBL there were numerous and large undisclosed contingent liabilities resulting from take-out letters and letters of guarantee issued by NBL in connection with loans made by Sharp and other defendants.

H. *Sharpstown Realty Company*

1. SRC, during the period January 1, 1968 through January 18, 1971 sold

3,064 shares of MCI through Ling & Co. and pledged a total of approximately 32,000 shares of NBL stock at DB&T.

I. *Oak Forest Investment Company*

OFIC, during the period January 1, 1968 through January 18, 1971, pledged a total of approximately 221,157 shares of NBL and 211,662 shares of MCI at SSB.

J. *John Osorio*

1. From January 1, 1968 to approximately July 1, 1970 defendant Osorio was president, a director and a member of the executive and finance committees of NBL and a trustee of NBL Plan. At all times pertinent hereto, he was a controlling shareholder of Nashwood. Between approximately June of 1968 and June of 1970 Osorio was a controlling shareholder of CB&T and DB&T. Between approximately March of 1969 and January 18, 1971, Osorio was a controlling shareholder of SAC and RIC. At all times pertinent hereto SAC owned between 31 percent and 32 percent of the outstanding stock of RIC. This holding represented voting control of RIC.

2. Between October 1, 1969 and January 18, 1971 Osorio, directly and through nominees, sold approximately 3,000 shares of MCI stock to Ling & Co.

3. Between January 1, 1968 and January 18, 1971 Nashwood, of which Osorio was a controlling shareholder, pledged 66,666 shares of NBL stock at SSB. At the time of such pledge defendant Sharp had undertaken to sell approximately 50,000 of these NBL shares for Nashwood for at least $1,375,000.00. The 66,666 shares of NBL stock pledged at SSB by Nashwood had been acquired from NBL in exchange for all of the outstanding stock of West Virginia Life Insurance Company.

4. Between January 1, 1968 and January 18, 1971 Nashwood, of which defendant Osorio was a controlling shareholder, pledged 5,931 shares of NBL stock as collateral for a loan in the amount of $162,000.00 from DB&T. These 5,931 shares were acquired from

Ling & Co. contemporaneously with the pledge, and $152,000.00 of the proceeds of the loan was used to purchase this stock. This loan has never been paid.

5. Between January 1, 1968 and January 18, 1971 Osorio pledged approximately 222,735 shares of SAC stock at CB&T as collateral for a loan to Osorio and defendant Carr. At the time of this pledge the principal asset of SAC was 1,040,000 shares of RIC stock, which was then pledged as collateral for loans to SAC and RIC at the Bank of Louisville, Louisville, Kentucky.

6. On or about October 10, 1969 the loan was paid by making a new loan at Exchange Bank & Trust [EB&T]. This loan was initially in the name of Waggoner Carr and John Osorio, jointly, and was subsequently changed to the name of Waggoner Carr only, with a guarantee by John Osorio.

7. On or about October 10, 1969 Osorio signed a letter of guarantee on behalf of NBL, guaranteeing payment of this loan to EB&T. On or about December 23, 1970 this loan was purchased by NBL from EB&T. At all times the loan has been secured by 222,732 shares of SAC stock in the name of John Osorio.

8. Between January 1, 1968 and January 18, 1971 defendant Osorio and other defendants directed David Hoover to pledge approximately one million shares of RIC stock, directly and through nominees, at various banks, including but not limited to South Oak Cliff State Bank of Dallas, Liberty Bank of Houston, Industrial State Bank of Houston, First Bank of Houston, First National Bank of Angleton, First National Bank of Lake Jackson and First State Bank of Overton.

9. Defendant Osorio, through SAC, pledged 75,000 shares of RIC stock at NBL and through United National Enterprises, Inc. 35,000 shares of RIC stock at NBL. Approximately $400,000.00 of the proceeds of the pledge of RIC stock was used by Hoover to buy

stock of NBL from Ling & Co., between January 1 and July 1, 1970.

10. On or about January 7, 1970 defendant Osorio, through West Virginia Life Insurance Company (which was then a wholly owned subsidiary of Nashwood), purchased 10,000 shares of MCI stock from Ling & Co.

11. On or about April 21, 1970 defendant Osorio, through SAC, placed an order for 7,000 shares of MCI stock at Ling & Co. Thereafter defendant Osorio caused NBL Plan to borrow $105,-000.00 at DB&T for the purpose of paying for the MCI stock previously purchased by SAC. That loan has never been paid.

12. On or about March 15, 1970 defendant Osorio caused NBL Plan to place an order for 22,500 shares of NBL stock at Ling & Co., and caused NBL Plan to pledge that stock as collateral for a loan at DB&T. As a control person of DB&T and CB&T, defendant Osorio caused these entities to jointly furnish these funds to NBL Plan for the purpose of acquiring this stock.

13. Between January 1, 1968 and January 18, 1971 defendant Osorio arranged for CB&T to loan FLAP, Inc. a total of $165,371.23 for the purpose of enabling FLAP, Inc. to acquire approximately 3,000 shares of NBL stock and approximately 10,800 shares of OLI stock from Ling & Co.

14. Between January 1, 1968 and January 18, 1971 defendant Osorio arranged for DB&T to loan defendant Adams approximately $46,500.00 to enable defendant Adams to purchase approximately 600 shares of NBL and approximately 1,208 shares of MCI from Ling & Co.

15. Between January 1, 1968 and January 18, 1971 defendant Osorio caused defendant NBL Plan to sell 2,-600 shares of MCI stock to Ling & Co. at $1 per share.

16. During the period January 1, 1968 up to and including January 18, 1971 Osorio participated in and employed a device, scheme and artifice to defraud for the purpose of manipulating the market in the common stock of NBL, OLI and MCI, by directly and through other defendants causing Ling & Co., a registered broker-dealer, to make a market in the stocks of these companies, by arranging for financing of purchases of these stocks through SSB, CB&T, DB&T and NBL, and by causing Nashwood, West Virginia Life Insurance Company, NBL Plan, SAC, Hoover and Byram to make purchases of these securities for the purpose of decreasing the amount of these securities available in the market, resulting in a corresponding increase in the market price of these securities, and by issuing false and misleading press releases and financial statements concerning the operations of NBL and NBL-proposed mergers and acquisitions.

17. In connection with the sales and pledges of NBL, OLI and MCI stock referred to in subparagraphs J. 2, 3, 4, 10, 11, 12, 13, 14, and 15 above and in connection with the manipulation of the market price of these stocks referred to in subparagraph 16, Osorio, directly and through certain other defendants made misrepresentations of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as more fully set out in paragraphs G. 7(a) through G. 7(d) above.

18. As president and as a member of the finance committee of NBL, defendant Osorio directed NBL to loan defendant Carr approximately $268,000.00, secured by a pledge of stock of National Data Communications, Inc. [NDC], at a time when that stock was restricted in nature. Subsequently defendant Osorio caused NBL Plan to purchase 4,270 shares of that stock, the proceeds from which were used to pay a portion of defendant Carr's indebtedness at NBL, and caused West Virginia Life Insurance Company to purchase 10,000 shares of that stock from NBL at a price sufficient to pay off the remainder of the indebtedness of defendant Carr to NBL. Defendant Osorio caused the remaining

10,000 shares of NDC stock to be pledged as collateral for a loan to Nashwood by NBL.

19. Defendant Osorio arranged for NBL to loan defendant Carr approximately $90,000.00, secured by 10,000 shares of stock of Siboney Corporation, which loan was subsequently transferred to the name of Nashwood Corporation and which stock was released by NBL and sold by Nashwood through Ling & Co. The loan was never paid.

### K. Tom Max Thomas

1. At all times pertinent hereto the defendant Tom Max Thomas was a controlling person of Nashwood. Thomas was secretary, general counsel, and a director of MCI. Between approximately April 15, 1969 and September 1, 1970 defendant Thomas was secretary of SAC and assistant secretary of RIC.

2. Between January 1, 1968 and January 18, 1971 Thomas sold approximately 1,000 shares of NBL stock, and approximately 200 shares of MCI.

3. In connection with the making of the market of MCI stock by Ling & Co., Thomas furnished defendant Adams 10,-000 shares of MCI stock in approximately October of 1969.

4. As a controlling person of Nashwood, defendant Thomas participated in the transactions by Nashwood in NBL and MCI stock, as more fully set out above in paragraphs J. 3 and 4.

5. As secretary of SAC, defendant Thomas in April of 1970 authorized the transfer agent for RIC stock to reissue shares of RIC owned by SAC, without a restrictive legend on the stock certificates. In addition, defendant Thomas signed a document addressed "To Whom It May Concern," stating that there were no restrictions on RIC stock owned by SAC.

6. As secretary of SAC, defendant Thomas signed a resolution authorizing defendant Osorio to contract with defendant Hoover to pledge some 645,000 RIC shares as collateral for loans.

7. As secretary of SAC, defendant Thomas authorized the transfer agent for RIC to deliver approximately 500,000 shares of RIC stock to defendant Hoover.

### L. Waggoner Carr

1. At all times pertinent hereto defendant Waggoner Carr was a controlling shareholder of Nashwood.

2. Between approximately October of 1968 and June 1970 defendant Carr was a controlling shareholder and director of CB&T.

3. Between approximately October of 1969 and May of 1970 defendant Carr was chairman of the board and a member of the loan committee of CB&T.

4. At all times pertinent hereto defendant Carr was a controlling shareholder of SAC and RIC.

5. Between approximately April of 1969 and July of 1970 defendant Carr was a director, a vice president and chairman of the executive committee of RIC.

6. Between approximately April of 1969 and June of 1970 defendant Carr was a controlling shareholder of DB&T.

7. In his capacity as a controlling person of CB&T, defendant Carr approved the CB&T loan of $550,000.00 to Osorio and Carr, secured by 222,735 shares of SAC stock. While a controlling person and chairman of the board of CB&T and a controlling person of DB&T, those entities participated in a loan of $641,000.00 to NBL Plan, for the purpose of purchasing 22,500 shares of NBL stock.

8. As a controlling person, chairman of the board and member of the loan committee of CB&T, defendant Carr arranged for CB&T to make loans totaling approximately $165,371.23 to FLAP, Inc. to enable FLAP, Inc. to purchase stock of NBL and OLI from Ling & Co.

9. As a controlling person of Nashwood and DB&T, defendant Carr approved the Nashwood purchase of NBL stock and used DB&T to finance such purchase, as more fully set out in paragraph J. 4. While a controlling person

of Nashwood, which in turn owned West Virginia Life Insurance Company, that entity purchased MCI stock from Ling & Co., as more fully set out in paragraph J. 10.

10. As a controlling person of Nashwood, defendant Carr pledged 66,666 shares of NBL stock at SSB, as more fully described in paragraph J. 3.

## M. *J. Quincy Adams*

1. At all times pertinent hereto defendant J. Quincy Adams was a vice president and registered representative of Ling & Co., a registered broker-dealer.

2. From about January of 1969 through January 18, 1971 defendant Adams was a controlling shareholder of FLAP, Inc.

3. From about May of 1969 through about December of 1969 defendant Adams was a controlling shareholder of CB&T.

4. From about April of 1969 through January 18, 1971 defendant Adams was a member of the executive committee of SAC.

5. Between January 1, 1968 and January 18, 1971 defendant Adams sold approximately 1,000 shares of NBL stock; pledged as collateral for loans approximately 20,000 shares of NBL stock which he had purchased from Ling & Co.; pledged as collateral for loans approximately 7,000 shares of MCI stock which he purchased from Ling & Co., and pledged approximately 59,000 shares of OLI stock as collateral for loans, which stock he had purchased from Ling & Co.

6. Between January 1, 1968 and January 18, 1971 defendant Adams as a controlling shareholder of FLAP, Inc., sold 1,000 shares of NBL stock to Ling & Co. and pledged approximately 3,000 shares of NBL stock and approximately 10,800 shares of OLI stock as collateral for a loan at CB&T, which stock FLAP, Inc. purchased from Ling & Co.

7. Between January 1, 1968 and January 18, 1971 defendant Adams participated in and employed a device, scheme and artifice to defraud for the purpose of manipulating the market of the common stock of NBL, OLI and MCI, by causing Ling & Co., of which he was a vice president, to make a market in those stocks, by causing Ling & Co. to purchase substantial amounts of those stocks from brokers, by then selling those stocks for Ling & Co. to various of his customers, and by arranging for these customers to finance the purchase of these stocks at various banks controlled by defendants for the purpose of decreasing the amount of these securities available in the market, resulting in a corresponding increase in the market price of these securities.

8. In connection with the sales and pledges of NBL, OLI and MCI stock referred to in subparagraphs 5 and 6 above and in connection with the manipulation of the market price of these stocks referred to in subparagraph 7 above, Adams, directly and through other defendants, made misrepresentations of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as more fully set out in paragraphs G. 7(a) through G. 7(d).

## N. *David Hoover*

1. At all times pertinent hereto defendant David Hoover was an officer and controlling shareholder of United National Enterprises, Inc.

2. On or about May 5, 1970 defendant Hoover entered into a contract with SAC whereby defendant Hoover agreed to pledge or otherwise dispose of 645,000 shares of RIC stock for SAC.

3. Thereafter defendant Hoover or his agents personally journeyed to Louisville, Kentucky, for the purpose of picking up shares of RIC stock from the transfer agent, which shares had previously been issued in small denominations without any restrictive legend and which shares were then pledged as collateral for loans, as more fully set out in paragraphs J. 8 and J. 9.

4. At least $400,000.00 of the proceeds from the sale of RIC stock was used by defendant Hoover to purchase NBL stock from Ling & Co.

5. Defendant Hoover also pledged approximately 16,500 shares of NBL stock as collateral for loans at banks between January 1, 1968 and January 18, 1971.

O. *Audy Byram*

1. Defendant Audy Byram was from April of 1969 through June of 1970 a director and president of RIC.

2. Between January 1, 1968 and January 18, 1969 defendant Byram purchased 7,000 shares of NBL stock from Ling & Co., which he then pledged as collateral for a loan at SSB, which loan has never been paid.

3. On or about April 1970 defendant Byram, in his capacity as president and a director of RIC, signed financial reports of RIC which defendant Hoover and others used to obtain loans at various banks, secured by RIC stock, as more fully set out in paragraphs J. 8 and J. 9.

4. In approximately July of 1969 defendant Byram borrowed $150,000.00 from DB&T for the benefit of RIC, pursuant to the request of defendants Osorio and Joe P. Novotny.

5. Prior to becoming president of RIC, defendant Byram was directed by defendant Carr to journey to Houston, Texas, for the purpose of being approved by defendant Joe P. Novotny.

P. *Phillip M. Proctor*

1. At all times pertinent hereto defendant Phillip M. Proctor was employed as a trader by Ling & Co., a registered broker-dealer, and was a controlling person of FLAP, Inc.

2. As trader for Ling & Co., defendant Proctor participated in making a market in the securities of MCI, NBL and OLI, pursuant to instructions from defendants Adams and Sharp, which transactions had the effect of decreasing the number of these securities available in the market, thereby causing a corresponding increase in the market price of these securities.

3. As a trader for Ling & Co., defendant Proctor participated in the purchase of securities by Ling & Co. from defendants Sharp, NBL Plan, Thomas, Osorio, FLAP, Inc. and Farha.

4. As a controlling shareholder of FLAP, Inc., defendant Proctor participated in transactions by FLAP, Inc. in the securities of NBL and OLI, as more fully set out in paragraph M. 6 above.

Q. *South Atlantic Company*

1. As to South Atlantic Company, it participated in the pledging of RIC and SAC stock, as more fully set out in paragraphs J. 8 and J. 9 above.

2. As the holding company of DB&T, SAC participated in the granting of loans to numerous persons and corporations for the purchase of NBL and MCI stock, as more fully set out in paragraphs J. 4, 11, 12, and 14 above.

3. Between January 1, 1968 and January 18, 1971, SAC pledged a total of 32,000 shares of its stock as collateral for loans at DB&T and at NBL.

4. Between January 1, 1968 and January 18, 1971, SAC pledged a total of 75,000 shares of RIC stock as collateral for a loan at NBL.

R. *James Farha*

1. At all times pertinent hereto James Farha was a vice president and registered representative of Ling & Co. and a controlling shareholder of FLAP, Inc.

2. Between January 1, 1968 and January 18, 1971 defendant Farha sold 1,000 shares of NBL stock to Ling & Co.

3. As a controlling shareholder of FLAP, Inc., defendant Farha participated in the purchases, sales and pledges of NBL, OLI and MCI stock by FLAP, Inc., as more fully set out in paragraph M. 6.

S. *Nashwood Corporation*

Between January 1, 1968 and January 18, 1971 defendant Nashwood Corporation participated in transactions in the

securities of NBL and MCI, as more fully set out above.

### Conclusions of Law

■ The express purpose of Congress in enacting the Securities Act of 1933 and the Securities Exchange Act of 1934 was to provide the public with full and fair disclosure of all relevant information concerning securities offered to the public. Congress passed the securities laws in order to establish the means and the standard through which the public can rely on fair, honest and prudent conduct in the maintenance of a securities market free from fraudulent practices.[3]

■ In furtherance of this express legislative intent it is necessary to impose upon those persons who act as officers, directors and control persons of corporations, whose securities are offered to and held by the public and traded in the public market, a duty to conduct themselves as fiduciaries for the investing public. This standard demands that these control persons and those other participants in the distribution of securities held by public companies exercise due diligence in carrying out their duties toward the corporation and the investing public.[4] The securities laws will not tolerate disinterested and accommodating positions and actions by persons charged with responsibility for control of corporations whose securities are publicly held and publicly traded.[5]

The complaint alleges that the defendants violated or aided and abetted the violation of Section 5 of the Securities Act of 1933 and Section 10(b) of the Exchange Act of 1934. Section 5(a) and (c) makes unlawful the use of the mails or instruments of interstate commerce to sell or to deliver after a sale a security unless a registration statement is in effect for that security or transaction. Liability attaches under section 5 only if the person qualifies as "an issuer, underwriter, or dealer." Section 4(1), 15 U.S. C. § 77d(1). A person claiming an exemption from section 5 liability must prove that he does not fall into one of the three categories set out in section 4 (1).

■ Section 2(11) of the Securities Act defines an underwriter as "any person who has purchased securities from an issuer" for the purpose of selling or offering to sell in connection with a distribution. In addition, the section expands the definition of an issuer to that of "any person * * * controlling or controlled by the issuer, or any person under * * * common control with the issuer." When a person in a control relation with an issuer is involved in a transaction with an "underwriter" in connection with the distribution of a security, that person comes within the ambit of the registration requirements of section 5. Securities & Exch. Comm'n v. North Am. Research & Dev. Corp., 424 F.2d 63, 72 (2d Cir. 1970).

In the present case, the various defendants exercised or were in the position to exercise actual control or power of control over the issuing public corporations. The indicia of control evidenced by the defendants included stock ownership, directorship positions, officerships, family ties, creditor positions and "dominating persuasiveness" (as reflected in testimony concerning Sharp). Sommer, Who's "In Control"?—S.E.C., 21 Bus.Law. 559, 575 (1966).

---

3. S.Rep.No.47, 73rd Cong., 1st Sess. 1 (1933).

4. Ashby v. Peters, 128 Neb. 338, 258 N.W. 639, 643 (1935); People v. Photocolor Corp., 156 Misc. 47, 281 N.Y.S. 130, 136–138 (1935); O'Connor v. First Nat. Investors Corp., 163 Va. 908, 177 S.E. 852 (1935).

5. Securities & Exch. Comm'n v. North Am. Research & Dev. Corp., 424 F.2d 63, 81–82 (2d Cir. 1970); Brennan v. Midwestern United Life Ins. Co., 259 F. Supp. 673, 681 (N.D.Ind.1966); 286 F. Supp. 702 (1968), aff'd, 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970).

■ When a controlling person places securities of the controlled corporation with a person who disposes of the securities to the public or takes with a view to dispose to the public the disposition assumes the character of a distribution or "public offering." The person taking becomes an underwriter. The Securities Act contains no express definition of the terms "distribution" or "public offering." The Supreme Court, however, has delineated weight factors for determining whether a particular disposition is a distribution. It concluded that when securities come from a person into the hands of the public for whom Congress designed the securities laws to protect then those transactions constitute a public offering. Securities & Exch. Comm'n v. Ralston Purina Co., 346 U.S. 119, 124–125, 73 S.Ct. 981, 97 L.Ed. 1494 (1953).

■ In this case the defendants on many occasions without registering the transactions pledged unregistered securities of controlled companies as collateral for loans. Courts have held that a pledge of stock is a "disposition of a security or interest in a security, for value" and therefore constitutes a "sale" as that term is defined in Section 2(3) of the Securities Act. Securities & Exch. Comm'n v. Guild Films Co., 279 F.2d 485 (2d Cir.), cert. denied sub nom. Santa Monica Bank v. Securities & Exch. Comm'n, 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960). The evidence indicates that the defendants pledged the securities and received value. Furthermore, the evidence reflects that there was a strong likelihood at the time of the pledges that the notes would go into default, which in fact occurred. The issuing companies were at the time of the pledging in a declining financial condition, and the defendants had manipulated the market price of the securities in order to artificially increase their value.

■ The banks accepted the stock from the control persons and then were in the position of having to sell the stock upon default in satisfaction for the debt. In such a role the banks became underwriters for the pledged stock. Under these conditions, the pledgors, as control persons of the issuing companies or as persons controlled by the issuer, disposed of the stock in " 'transactions by underwriters' which are not within the exemptions of [section] 4(1)" United States v. Wolfson, 405 F.2d 779, 782 (2d Cir. 1968), cert. denied, 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969).

■ There are, of course, no exemptions from the operation of the anti-fraud provisions of the securities laws. A person comes within the ambit of section 10(b) when he engages in fraudulent or manipulative activities in connection with the purchase or sale of securities. The complaint alleges that the defendants used the instruments of interstate commerce to engage in manipulative and deceptive devices which operated as a fraud on the investing public. The *Findings of Fact* amply illustrate that there were manipulations, misrepresentations, and fraud sufficient to constitute violations of the securities laws. *See* Superintendent of Ins. of State of New York v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

Certain of the defendants did not directly participate in the pledging or sale of the unregistered stock nor did they directly design or participate in the scheme to manipulate the securities. These defendants, however, aided and abetted the distribution of the unregistered securities or the manipulation and scheme to defraud. A person may be responsible for violations of the securities laws and may be enjoined from further violations if such person had an affirmative duty to know what was occurring with respect to corporations in which he had a position of control and if his action or inaction had a tendency to aid or abet the violation.[6] It is not

---

6. Carroll v. First Nat'l Bank, 413 F.2d 353, 357–358 (7th Cir. 1969); Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, 410 F.2d 135, 144 (7th Cir.), cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969); Brennan v. Mid-

necessary for a defendant to have personally engaged in an actual purchase or sale of the security involved in order to be liable for violations of the federal securities laws. It is sufficient that, by action or inaction, the defendant participated in or aided and abetted the violation.[7]

1. Defendant Frank W. Sharp violated the provisions of Section 5(a) and (c) of the Securities Act in the sale of NBL stock.

As the controlling shareholder of SRC and OFIC, Frank W. Sharp violated the provisions of Section 5(a) and (c) of the Securities Act by pledging stock of NBL and MCI.

As a control person of OLI, defendant Frank W. Sharp violated Section 5(a) and (c) of the Securities Act in the pledge of NBL and OLI stock.

Defendant Frank W. Sharp, individually and as a controlling person of NBL, MCI, OLI, SSB, SRC, and OFIC employed a scheme and device to defraud and to manipulate the common stock of NBL, OLI and MCI, in violation of Section 10(b) of the Exchange Act.

Defendant Frank W. Sharp aided and abetted violations of Section 5(a) and (c) of the Securities Act and Section 10 (b) of the Exchange Act in connection with transactions in the securities of NBL, MCI and OLI by defendants SRC, OFIC, Osorio, Thomas, Carr, Adams, Hoover, Byram, Proctor, SAC, Farha and Nashwood.

2. By selling stock of MCI through Ling & Co., SRC violated Section 5(a) and (c) of the Securities Act.

By pledging NBL stock at DB&T and SSB, SRC violated Section 5(a) and (c) of the Securities Act.

As a controlling shareholder of SSB, SRC employed a scheme and device to manipulate the common stock of NBL, OLI and MCI, in violation of Section 10 (b) of the Exchange Act.

3. By pledging unregistered shares of NBL and MCI, OFIC violated Section 5(a) and (c) of the Securities Act.

By providing financing to defendants and others for the purpose of purchasing NBL, OLI and MCI stock, OFIC employed a scheme and device to manipulate those stocks, in violation of Section 10(b) of the Exchange Act.

4. There is not sufficient evidence in the record to support a finding of violations of either Section 5 of the Securities Act or Section 10(b) of the Exchange Act by Oak Forest Realty Company.

5. By selling unregistered MCI stock, defendant John Osorio violated the provisions of Section 5(a) and (c) of the Securities Act.

By pledging unregistered SAC stock as collateral for loans, defendant Osorio violated Section 5(a) and (c) of the Securities Act.

By pledging unregistered RIC stock through SAC, Hoover and others as collateral for loans, Osorio violated the provisions of Section 5(a) and (c) of the Securities Act.

As a controlling shareholder of Nashwood, defendant Osorio through Nashwood pledged NBL stock as collateral for loans, in violation of Section 5(a) and (c) of the Securities Act.

As a controlling person of NBL, NBL Plan, CB&T, DB&T, SAC and Nashwood, defendant John Osorio participated in transactions in the securities of NBL, MCI and OLI, in violation of Section 5 (a) and (c) of the Securities Act.

As a controlling person of NBL, NBL Plan, CB&T, DB&T, SAC and Nashwood, defendant John Osorio employed a scheme and device to manipulate the common stock of NBL, MCI and OLI in violation of Section 10(b) of the Exchange Act.

western United Life Ins. Co., 259 F. Supp. at 676–682; Pettit v. American Stock Exch., 217 F.Supp. 21 (S.D.N.Y. 1963).

7. Securities & Exch. Comm'n v. Barraco, 438 F.2d 97, 100 (10th Cir. 1971); Securities & Exch. Comm'n v. North Am. Research & Dev. Corp., 424 F.2d at 81–82; Gross v. Securities & Exch. Comm'n, 418 F.2d 103, 107 (2d Cir. 1969); Nees v. Securities & Exch. Comm'n, 414 F.2d 211, 220–221 (9th Cir. 1969).

6. Defendant Tom Max Thomas. in the sale of NBL and MCI stock, violated the provisions of Section 5(a) and (c) of the Securities Act.

As a controlling person of SAC and Nashwood, defendant Thomas violated the provisions of Section 5(a) and (c) of the Securities Act by pledging RIC and NBL stock as collateral for loans.

As a controlling person of MCI, defendant Thomas participated in a scheme to defraud in connection with transactions in MCI stock, in violation of the provisions of Section 10(b) of the Exchange Act.

As a controlling person of Nashwood, defendant Thomas aided and abetted the employment of a device and scheme to manipulate the market in the stock of NBL by defendants Sharp, SRC, OFIC, Osorio, Adams, Hoover, Proctor, Farha and Nashwood, in violation of Section 10(b) of the Exchange Act.

7. Defendant Waggoner Carr violated the provisions of Section 5(a) and (c) of the Securities Act by pledging SAC stock whose principle asset was RIC stock as collateral for loans.

As a controlling person of Nashwood, DB&T, CB&T and RIC, defendant Carr aided and abetted violations of Section 5(a) and (c) of the Securities Act in the pledge of RIC and NBL by and to those entities.

As a controlling person of the entities just enumerated, defendant Carr aided and abetted the employment of a device and scheme to manipulate the market in the common stock of NBL and MCI in violation of Section 10(b) of the Exchange Act.

8. Defendant J. Quincy Adams, in the sale and pledge of stock by NBL, MCI and OLI, violated Section 5(a) and (c) of the Securities Act.

As vice president and a registered representative of Ling & Co., defendant Adams participated in a scheme with defendants Osorio and Sharp to manipulate the market in the common stock of NBL, MCI and OLI, in violation of Section 10 (b) of the Exchange Act.

As a registered representative of Ling & Co. and as a shareholder and control person of FLAP, Inc., defendant Adams engaged in transactions involving misrepresentations of material facts and omissions to state material facts in the sale of NBL, MCI and OLI stock, in violation of Section 10(b) of the Exchange Act.

Defendant Adams aided and abetted violations of Section 5(a) and (c) of the Securities Act and Section 10(b) of the Exchange Act in connection with transactions in the securities of NBL, MCI and OLI by defendants Sharp, SRC, OFIC, Osorio, Thomas, Hoover, Proctor, Farha and Nashwood.

9. Defendant David Hoover participated in a scheme to distribute unregistered shares of RIC stock and SAC stock by pledging such stock as collateral for loans, in violation of Section 5(a) and (c) of the Securities Act.

Defendant Hoover participated in a scheme and artifice to defraud various lending institutions by pledging NBL and RIC stock, in violation of Section 10(b) of the Exchange Act.

By using the proceeds of loans secured by RIC stock to purchase NBL stock, defendant Hoover aided and abetted the employment of a device and scheme to manipulate the market price of NBL, in violation of Section 10(b) of the Exchange Act.

10. In the pledge of unregistered NBL stock as collateral for loans, defendant Byram violated the provisions of Section 5(a) and (c) of the Securities Act.

Defendant Byram's purchase of NBL stock from Ling & Co., at the behest of defendant Osorio through defendant Adams, had the effect of aiding and abetting a scheme to manipulate the market price of NBL stock employed by defendants Adams, Osorio and Sharp, in violation of Section 10(b) of the Exchange Act.

As a director and president of RIC, defendant Byram signed certain reports published by RIC, which had the effect

of aiding and abetting the distribution of unregistered RIC stock by defendants Hoover, Thomas, Osorio and Carr, through the pledge of this stock as collateral for loans at banks, in violation of Section 5(a) and (c) of the Securities Act.

11. As a control shareholder of FLAP, Inc. defendant Proctor aided and abetted the distribution of unregistered shares of MCI, NBL and OLI stock, in violation of Section 5(a) and (c) of the Securities Act.

In his capacity as a securities trader for Ling & Co., and controlling shareholder of FLAP, Inc., defendant Proctor aided and abetted a device and scheme to manipulate the market in the stock of NBL, OLI and MCI by defendants Sharp, Osorio and Adams, in violation of Section 10(b) of the Exchange Act.

12. Defendant SAC participated in an unregistered distribution of RIC stock through the pledge of RIC stock and SAC stock as collateral for loans, in violation of Section 5(a) and (c) of the Securities Act.

In the pledge of shares of RIC and SAC stock as collateral for loans, defendant SAC engaged in a course of business which operated as a fraud or deceit upon the lenders, in violation of Section 10(b) of the Exchange Act.

In the purchase of NBL and MCI stock and as a controlling person of DB&T, through which purchases of NBL and MCI stock were financed for other defendants, defendant SAC aided and abetted a device and scheme to manipulate the market of these stocks by defendants Sharp, Osorio and Adams, in violation of Section 10(b) of the Exchange Act.

13. As a representative and vice president of Ling & Co., and as a controlling shareholder of FLAP, Inc., defendant Farha aided and abetted the distribution of unregistered shares of MCI, NBL and OLI stock, in violation of Section 5(a) and (c) of the Securities Act.

As a vice president and registered representative of Ling & Co., and a control-

ling shareholder of FLAP, Inc., defendant Farha aided and abetted a scheme and device to manipulate the market price of NBL, OLI and MCI stock by defendants Sharp, Osorio and Adams, in violation of Section 10(b) of the Exchange Act.

14. In the pledge of NBL and MCI stock, defendant Nashwood Corporation participated in a scheme to distribute unregistered stock, in violation of Section 5(a) and (c) of the Securities Act.

In the purchase of NBL and MCI stock from Ling & Co., defendant Nashwood Corporation aided and abetted a device and scheme to manipulate the market price of these stocks by defendants Sharp, Osorio and Adams, in violation of Section 10(b) of the Exchange Act.

*Order of Permanent Injunction*

Based upon the above findings of fact and conclusions of law,

It is hereby ordered, adjudged and decreed that defendants Frank W. Sharp, Sharpstown Realty Company, Oak Forest Investment Company, John Osorio, Tom Max Thomas, Waggoner Carr, J. Quincy Adams, David Hoover, Audy Byram, Phillip M. Proctor, James Farha and Nashwood Corporation, their officers, directors, employees, attorneys, agents, servants and assigns, and each of them, are hereby permanently enjoined from, directly or indirectly—

A. making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, the common capital stock of National Bankers Life Insurance Company, Olympic Life Insurance Company, Master Control, Inc. or any other securities unless and until a registration statement has been filed with the Securities and Exchange Commission as to such securities;

B. making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell the common capital stock of National Bankers Life Insur-

ance Company, Olympic Life Insurance Company, Master Control, Inc. or any other securities, through the use or medium of any prospectus or otherwise, unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities;

C. carrying such securities or causing them to be carried through the mails or in interstate commerce, by any means or instruments of transportation for the purpose of sale or delivery after sale unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities.

It is further ordered that defendants John Osorio, Tom Max Thomas, David Hoover, Audy Byram, Waggoner Carr and South Atlantic Company, their officers, directors, employees, attorneys, agents, servants and assigns, and each of them, are permanently enjoined from, directly or indirectly—

A. making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, the common capital stock of RIC International Industries, Inc. or any other securities unless and until a registration statement has been filed with the Securities and Exchange Commission as to such securities;

B. making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell the common capital stock of RIC International Industries, Inc. or any other securities, through the use or medium of any prospectus or otherwise, unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities;

C. carrying such securities or causing them to be carried through the mails or in interstate commerce by any means or instruments of transportation for the purpose of sale or deliv-

ery after sale unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities;

provided, however, that nothing in the foregoing portions of this order of permanent injunction shall apply to any security or transaction which is exempt from the provisions of Section 5 of the Securities Act of 1933, as amended.

It is further ordered that defendants Frank W. Sharp, Sharpstown Realty Company, Oak Forest Investment Company, John Osorio, Tom Max Thomas, Waggoner Carr, J. Quincy Adams, David Hoover, Audy Byram, Phillip M. Proctor, South Atlantic Company, James Farha and Nashwood Corporation, their officers, directors, employees, attorneys, agents, servants and assigns, and each of them, are permanently enjoined from directly or indirectly, in connection with the purchase or sale of the common capital stock of National Bankers Life Insurance Company, Olympic Life Insurance Company, Master Control, Inc. or any other securities by use of any means or instrumentality of interstate commerce or of the mails—

A. employing any device, scheme or artifice to defraud, or

B. making any untrue statements of material facts or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading concerning:

1. the artificial nature of the market price of the securities being sold;

2. the financial condition of the issuer or its affiliates;

3. the use of assets of the issuer for the benefit of controlling persons of the issuer;

4. the distribution of unregistered securities of the issuer by controlling persons of the issuer;

5. the necessity for registration of the securities being sold;

6. the existence of proposed mergers or acquisitions by the issuer with other companies and the fact that such companies are controlled by persons in control of the issuer, or

C. engaging in any transactions, practices or courses of business which operate or would operate as a fraud or deceit upon any person.

All relief requested by Plaintiff not herein granted is denied.

It is further ordered that Plaintiff's cause of action against Oak Forest Realty Co. is hereby dismissed with prejudice.

It is further ordered that all motions and requests for amended and additional Findings and Conclusions not herein made are denied.

A copy of this Injunctive Order shall be personally served upon each of the defendants named herein.