**In the Matter of FOUR SEASONS NURS-
ING CENTERS OF AMERICA,
INC., Debtor.**

**No. BK–70–1008.**

United States District Court,
W. D. Oklahoma.

July 14, 1971.

Harold C. Heiss, Gen. Counsel, State of Ohio, Charles S. Rawlings and Richard B. Igo, Asst. Attys. Gen., Columbus, Ohio, for petitioner, State of Ohio.

Grant Guthrie, and Donald Dreyfus, Chicago, Ill., Attys. for Securities and Exchange Comm.

James R. Tolbert, III, Trustee, Loyd Benefield and Robert E. Manchester, Oklahoma City, Okl., Attys. for Four Seasons Nursing Centers of America, Inc., debtor corporation in Bankruptcy Chapter X Reorganization.

Arthur Matthews and Michael R. Klein, Washington, D. C., Attys. for Jack L. Clark, former president of the debtor corporation.

## MEMORANDUM OPINION

BOHANON, Chief Judge.

In this reorganization bankruptcy case under Chapter X, the State of Ohio has filed a claim or Petition for Reclamation for the sum of $4,000,000.

The petitioner hereinafter referred to as "Ohio" claims preference right to the sum of $4,000,000 which it alleges is due it because of certain loans made by petitioner to Four Seasons Nursing Centers of America, Inc., the debtor corporation, on March 9, 1970, and March 23, 1970, upon unsecured promissory notes executed by the debtor corporation to the State of Ohio.

Petitioner asserts:

A. That the debtor corporation intentionally and fraudulently made material misrepresentations in order to procure the money from petitioner in that the debtor corporation overstated its sales and assets for the period ending December 31, 1969, in order to procure from National Credit Office, New York, a division of Dun & Bradstreet, a "prime" rating on the debtor corporation's notes for commercial paper;

B. That the debtor corporation through its agents made false and misleading statements and furnished false and misleading information to National Credit Office concerning its financial condition;

C. That in reliance upon this false information, National Credit Office did issue the debtor corporation a prime rating for commercial paper and that the petitioner received this information from National Credit Office through Crofters, Inc;

D. That in reliance thereon the petitioner did lend to the debtor corporation the sum of $4,000,000 upon the debtor corporation's promissory notes; and

E. Petitioner also contends that the loan of $4,000,000 to the debtor corporation was in violation of a statute of the State of Ohio, was therefore void and that consequently the money should be returned to the Ohio State Treasurer.

On March 9, 1970, the debtor corporation made, executed and delivered to petitioner two promissory notes, the first in the sum of $2,000,000 and the second in the sum of $1,000,000, and on March 23, 1970, issued a similar note to petitioner for $1,000,000, making a total of $4,000,000, each bearing interest at 9½ percent.

Petitioner alleges that this money was loaned to the debtor corporation as a result of the fraudulent misrepresentations aforesaid and that but for said false misrepresentations petitioner would not have loaned the money, and the debtor corporation is a converter without title or right of possession and, therefore, the debtor corporation had no title to pass to the Trustee.

The Trustee has filed a general denial thus casting upon the petitioner the burden to prove the allegations of its Petition for Reclamation.

The Court has heard the testimony of witnesses sworn and examined in open court, has read carefully the voluminous testimony in deposition form by various witnesses and has carefully studied the pleadings and briefs filed by the parties, and from a careful study of the depositions, all papers, documents, briefs and arguments before the Court, the Court has come to the conclusion that petitioner has failed to prove the allegations in its Petition for Reclamation, and therefore, such Petition, claims and prayer for relief must be denied.

## FINDINGS OF FACT

1. During the early part of the year 1970, particularly sometime in January, 1970, the president of the debtor corporation, Jack L. Clark, received information that a man by the name of Ronald R. Howard of Los Angeles, California, a "finder of money", was in a position to assist the debtor corporation in borrowing funds which it needed in the operation of its business and for the purpose of constructing certain nursing homes throughout the United States and particularly in the State of Ohio.

2. Mr. Howard, in the role of a "finder of money" and Mr. Clark had a conference in Oklahoma City, Oklahoma, for the purpose of consummating a deal, or a tentative deal, for borrowing funds, which turned out to be from the State of Ohio. It was originally anticipated that the debtor corporation would borrow $20,000,000 to $24,000,000 through this source.

3. Ronald R. Howard about this time or previous thereto made contact with an investment firm in the City of Columbus, Ohio, by the name of Crofters, Inc., and particularly with Harry A. Groban, Executive Vice President of the firm. This firm was a client of National Credit Office, New York, and subscribed to the services of that company. Mr. Groban requested a rating from National Credit Office on the debtor corporation and advised Mr. Merker of the National Credit Office that it could get such information as it needed from the debtor corporation through Mr. John Mee, a Vice President and attorney for the debtor corporation. Mr. Merker in turn telephoned Mr. Mee in Oklahoma City and requested of him the latest annual report and subsequent intraoperating statements and bank information relating to the debtor corporation. Mr. Merker did receive the information which he requested, particularly the annual report and subsequent unaudited financial data (Petitioner's Exhibits 24, 25). National Credit Office, through Mr. Merker, gave the debtor corporation a rating of "prime" for commercial paper and communicated this information by letter to Mr. Groban. Mr. Groban in turn furnished this information to Mr. Robert F. Gardner, Deputy Treasurer of the State of Ohio.

4. "Commercial paper" is defined by Mr. Merker as paper of not more than 270 days duration and for a "prime" rating required a net worth or capital funds of the corporation of at least $25,000,000.

5. It appears that according to the laws of the State of Ohio, the Treasurer of that State could lend money of the State up to $50,000,000 on commercial

paper rated "prime" by National Credit Office.

6. After receipt from National Credit Office of its letter rating the debtor corporation as "prime" for commercial paper, Mr. Groban of Crofters, Inc., advised Mr. Mee that funds would be available from the state of Ohio to the debtor corporation. Thereafter, Mr. Alex Russell, an officer of the debtor corporation, went to Columbus, Ohio, and on March 9, 1970, consummated a loan of $3,000,000 for the debtor corporation from the State of Ohio evidenced by two promissory notes of the debtor corporation, one for $2,000,000 payable in 120 days and another for $1,000,000 due in two years. These loans were consummated by and through Robert F. Gardner, Deputy Treasurer of the State of Ohio in the Office of the Treasurer of the State of Ohio with Mr. Groban and Mr. Alex Russell present. This first loan ($2,000,000) was made on the basis of 120 days with the understanding that when due the note would be reviewed for a period of two years; that is, that there would be a "roll-over" as used by men in finance meaning an automatic extension of the loan for a period of two years. A similar note for $1,000,000 due and payable in two years was made to the State of Ohio on March 23, 1970. All of the funds represented by the notes on March 9 and the note of March 23 were transmitted to the debtor corporation.

7. Mr. Robert F. Gardner was the officer of the State of Ohio who handled the transactions for the State and he was at that time Deputy Treasurer of the State of Ohio.

Mr. Gardner requested of Mr. Groban of Crofters, Inc., certain information regarding financial data relating to the debtor corporation, and this was furnished and was in the possession of Mr. Gardner when the loans were made. Mr. Gardner received a year-end statement for 1968 and an unaudited balance sheet as of December 31, 1969. Mr. Gardner testified in part as follows:

"Q. Are you an accountant, Mr. Gardner?

A. Yes, I am.

Q. And you are a certified public accountant?

A. Yes, I am.

Q. What additional information did you then seek, if you did seek any?

A. The additional information I was after was the matter of the one amount on the assets side of the balance sheet. It was a large figure. I believe it was classified as receivables of some sort, being a current asset, and it was a significant figure in relation to net worth. I wanted to know a little bit more of what that consisted of.

Q. And did you obtain that information?

A. To my satisfaction, yes.

Q. How did you obtain it?

A. I called the bank out in Oklahoma City, I believe.

Q. Do you recall the name of the bank? If you recall.

A. No, no.

Q. Do you recall the individual to whom you spoke in Oklahoma City?

A. No.

Q. Could you relay the substance of your conversation? First, what month, what date, again, was this conversation? Early March?

A. I'd say early March.

Q. You say you obtained the information to your satisfaction?

A. Yes."

Mr. Gardner testified that on the $2,-000,000 loan for 120 days, there was a conversion feature that upon maturity the $2,000,000 note would be renewed for a two-year period of time "all things being equal."

8. The words "commercial paper" were defined by Rudolph Merker, Vice President of National Credit Office, a mercantile credit reporting agency reporting on a vast number of concerns in

various lines of business. Mr. Merker testified in part as follows:

"Q. Could you describe for the record, please, the nature of the duties you are required to perform as Vice-President of the National Credit Office?

A. I am in charge of the commercial paper division.

Q. Would you explain for the record what the commercial paper division is?

A. It's a reporting division to assign a line of credit or a rating on a company for the commercial paper market.

Q. How long has that division existed?

A. Since 1920.

Q. Now, you spoke of commercial paper and a commercial paper division, Mr. Merker. Would you define commercial paper as used by the National Credit Office?

A. Commercial paper is a promissory note with maturities that do not extend over 270 days."

9. The Court finds that Mr. Gardner, the Deputy Treasurer of the State of Ohio, obviously knew what commercial paper was, and the rating given by National Credit Office to the debtor corporation was only for commercial paper, 270 days. Mr. Gardner was at no time considering a loan to the debtor corporation on commercial paper basis; the loans were for two years or more.

■ 10. The commercial paper rating given by National Credit Office is really of no significance in this case because in truth and in fact the State of Ohio purchased no commercial paper from the debtor corporation. All of the paper purchased by Ohio was for a period of two years which is not commercial paper. No doubt the "prime" rating given by National Credit Office was of some benefit to Ohio in assessing the debtor corporation for loans, but aside from this rating the Deputy Treasurer of Ohio, being a certified public accountant and attorney, and no doubt being experienced in investment policies, made his own independent investigation and satisfied himself by long distance telephone with a bank in Oklahoma City that the loans were proper loans for the State of Ohio to make.

11. Section 135.14, Ohio Revised Code provides in pertinent part as follows:

"In addition to the investments specified in subparagraphs A, B and C in this section, the treasurer of state may invest interim moneys of the state in commercial paper notes issued by any corporation for profit, which is incorporated under the laws of the United States, a state, or the District of Columbia, which such notes are rated prime by the National Credit Office, Inc., New York, or its successor provided that the aggregate total amount of interim moneys invested in commercial paper at any time shall not exceed fifty million dollars [$50,000,-000]."

Inasmuch as the sale of the debtor notes were not commercial paper as defined, and not so intended to be by either party, this statute above quoted does not apply and is not applicable to petitioner's request for reclamation.

12. The Court finds that the State of Ohio filed its claim in the amount of $4,000,000 with the Trustee on the 15th day of September, 1970, as an unsecured promissory note claim, which was approved and allowed on June 2, 1971.

13. The Court further finds that the filing of the claim and allowance of the claim should not under all of the circumstances prejudice the right of the State of Ohio to prosecute its claim based upon fraud or irregularly loaned money and that the State of Ohio need not make an election as to remedies. Notwithstanding this fact, the Court does find that the State of Ohio is not entitled to an Order of Reclamation.

■ 14. There is no intimation in this record that Four Seasons defrauded the State of Ohio or made any misrepresentations to the State of Ohio, but at

all times dealt above board and submitted all information requested and withheld nothing. Mr. Gardner made no reliance upon any alleged fraudulent document or statement made by the debtor corporation, its officers or agents, and no fraud here exists, and no misrepresentations were made to the State of Ohio, or others.

15. Under the circumstances it would be grossly inequitable to all of the other creditors of the debtor corporation to allow Ohio to have the preference which it seeks.

## CONCLUSIONS OF LAW

1. The Court concludes as a matter of law that the Petition for Reclamation must be denied.

37 Am.Jur.2d, 598, 609:

"§ 438. As a general thing, in the absence of evidence to the contrary, the law presumes good faith, honesty, and fair dealing. Therefore, the general rule is that fraud is not presumed, but usually must be proved by the party alleging it. Thus, it is said that actual fraud is never presumed, and that fraudulent acts will not be presumed."

"§ 445. The rule which places upon a party who alleges fraud as the basis of a cause of action or defense the burden of establishing the fraud by the requisite quantum of proof requires him to prove the existence of the various elements of fraud constituting his cause of action or defense. Thus, the ultimate burden of proving the making of a false representation by or at the instance of the party charged with fraud, or of showing the falsity and materiality of the representation or any other element, such as knowledge, intent, reliance, etc., which may be a requisite of fraud for the purpose for which it is alleged, rests upon the party charging fraud, to be carried by him with the benefit of such inferences and presumptions as are raised under the facts produced in evidence. The foregoing principle is applicable

in a suit in equity for rescission, as well as in a law action for damages."

Manly v. Ohio Shoe Co. (4 C.A. 1928), 25 F.2d 384:

"Bankrupt's fraud, to justify rescission of contract and reclamation of goods by seller, must be established to the satisfaction of the court by clear, unequivocal, and convincing evidence."

An appropriate Judgment will be entered along with these Findings of Fact and Conclusions of Law prepared in Memorandum Opinion form.