SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellee,

v.

William V. COFFEY, Defendant-
Appellant,

and

John M. King, Defendant-Appellant.

Nos. 73-1396, 73-1397.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 4, 1973.

Decided March 28, 1974.

Jack R. Alton, Columbus, Ohio, for defendants-appellants; Lane, Alton & Horst, Columbus, Ohio, on briefs.

Paul Gonson, Asst. Gen. Counsel, Washington, D. C., for plaintiff-appellee; Lawrence E. Nerheim, Gen. Counsel, David Ferber, Sol., Martin S. Berglas, Atty., S.E.C., Washington, D. C., Donald Dreyfus, Atty., Chicago Regional Office, S.E.C., Chicago, Ill., on brief.

Before CELEBREZZE, Circuit Judge, McALLISTER, Senior Circuit Judge, and WILSON,* District Judge.

* The Honorable Frank W. Wilson, Chief Judge, United States District Court for the Eastern District of Tennessee, sitting by designation.

CELEBREZZE, Circuit Judge.

This case presents novel issues for this Circuit regarding the Securities and Exchange Commission's ability to enjoin corporate officials personally for alleged corporate violations of the federal securities laws, specifically, § 17(a)(1) and (3) of the 1933 Securities Act and § 10(b) of the 1934 Securities Exchange Act, and Rule 10b–5(1) and (3) promulgated thereunder. Appellants are the board chairman (John King) and the financial vice-president (William Coffey) of King Resources Company.[1]

The relevant events began when Crofters, Inc., an Ohio "money-finder" formed in 1969, offered to arrange loans totaling $22,000,000 from the State of Ohio to four companies charged in the SEC complaint.[2]

One of Crofters' clients was King Resources Company, a Maine corporation with its headquarters in Colorado, engaged in oil well drilling in over a hundred countries. In early 1970 King Resources was short of cash and was seeking loans from various sources. In February, 1970, Ronald Howard, an independent money-finder and a defendant in the proceedings below, approached William Coffey (then King Resources' financial vice-president) with the proposal that King Resources seek funds from the State of Ohio. Howard told Coffey that long-term arrangements were possible but that it was a legal prerequisite to obtaining funds from the State that a company's commercial paper be rated "prime" by the National Credit Office, Inc. (NCO), a division of Dun & Bradstreet. Defendant Groban, a Crofters partner, contacted Coffey on February 19, 1970, and requested information

that NCO would need to determine whether King Resources' commercial paper merited a prime rating. Coffey sent these materials to Groban. Groban then asked NCO to rate King Resources for the commercial paper market. Rudolph Merker, NCO's vice-president for commercial paper, requested further information of Coffey, which was forthcoming and is not alleged to have been false. NCO promptly rated King Resources prime for the commercial paper market, on February 26, 1970. Groban notified Ohio's Deputy Treasurer of King Resources' prime NCO rating, and the State bought from King Resources a two-year $3,000,000 note on April 17, 1970 and a two-year $5,000,000 note on May 1, 1970.

King Resources soon thereafter collapsed financially, rendering Ohio's notes virtually worthless. On November 16, 1970, the SEC sued to enjoin further violations of the securities laws by 17 defendants, including King Resources and Appellants Coffey and King. The SEC alleged three different categories of securities law violations, only one of which applied to King Resources and Appellants. The Commission alleged that King Resources had sold its notes by misrepresenting its prime rating on commercial paper as proof that its two-year notes were also rated "prime." It further alleged that King Resources had failed to disclose material facts concerning its financial condition and the proposed use of the loan proceeds, omissions which tended to mislead NCO and the State of Ohio.[3]

On the basis of depositions and briefs, the District Court disposed of Appellee's motion for summary judgment on its pe-

---

1. These were Appellants' position at the time of the alleged violations.

2. The loans of the four companies charged in the SEC's complaint were made through the Ohio Workmen's Compensation Fund and the Treasurer of Ohio. Both King Resources notes were purchased by the Treasurer.

3. The alleged omissions were that a large part of the funds to be obtained from the State was to be reloaned to other persons and that, at the time it issued its notes, King Resources was not meeting its obligations.

tition for a preliminary injunction on August 10, 1972, by issuing a temporary restraining order against all 17 defendants. In a lengthy opinion, it held:

> [O]n the state of facts now before us, the Court concludes that the defendants' use of the word "prime", as defined by N.C.O. and the customs of the securities industry, in connection with notes of terms in excess of 270 days, constituted a violation of the standard promulgated in O.R.C. § 135.14. Further, that such use of the term "prime", in connection with non-commercial paper tended to operate as a "device, scheme, or artifice to defraud" within the meaning of Section 17(a)(1) and of Section 10(b) and Rule 10b–5(1) thereunder; and further constituted the engaging in a "transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser" within the meaning of Section 17(a)(3) and Section 10(b) and Rule 10b–5(3) thereunder. [citations omitted]. This conduct on the part of the defendants constitutes activity which should be enjoined by the equitable powers of this court.[4]

By restraining the 17 defendants, the District Court avoided the question whether the Defendants, particularly Groban, had omitted material information or had made false statements in representing the various companies' financial situations to Rudolph Merker of NCO:

> What is actionable in this case is the use of prime ratings, regardless of how they were obtained, for a purpose which would tend to confuse and mislead the purchasers. Holding as we do, it is unnecessary to consider whether there was a material omission within the meaning of section 17(a)(2) and Rule 10b–5(2). Defendants had the obligation to insure that the ultimate use of the prime ratings

did not violate other provisions of Section 17(a) and 10(b). This obligation on their part might well have cautioned them to reveal that the terms of the various notes they intended to issue were in excess of 270 days and therefore not properly submitted for a prime rating. Deciding as we do, however, this determination is extraneous to the necessary grounds of our holdings.[5]

The District Court enjoined

> [T]he defendants who directly participated in obtaining prime ratings for Consolidated, Four Seasons and King Resources [who] knew or should have known that the notes ultimately issued were not properly described by the word "prime." [6]

These "directly participating" defendants included King Resources Company. Appellant King was enjoined as a "responsible officer" of King Resources.[7] Appellant Coffey was enjoined as an "aider and abettor" in the scheme.[8]

King Resources Company was nonetheless dismissed from the case because the District Court held that a prior Colorado injunction against the company was *res judicata* as to the present case. The SEC has not appealed that part of the ruling.

Soon after the temporary restraining order was issued, fourteen defendants submitted to consent decrees. Appellants persisted in their opposition to the SEC complaint and were afforded a hearing on consolidated motions for a preliminary and permanent injunction. They were allowed to present evidence concerning all factual matters, though the District Court refused to hear argument on the matters of law it had decided on August 10, 1972. On December 29, 1972, the District Court adopted the findings and conclusions of its August 10 Order in permanently enjoining Appellants from violations of § 17(a)(1) and (3), § 10(b), and Rule 10b–5(1) and

---

4. District Court Opinion and Order, printed at 351 F.Supp. 236, 254 (S.D.Ohio 1972).

5. *Id.* at 255–256.

6. *Id.* at 256.

7. *Id.*

8. *Id.*

(3). It held that Appellants "engaged in or are legally responsible for acts, including those which culminated in obtaining for King Resources Company a rating of 'prime' from [NCO], which was substantially employed in connection with notes of term in excess of 270 days."[9] Appellants attack this final judgment and order.

Before beginning a legal analysis of the District Court's actions, we confront a basic difference between the parties. Appellants argue that the District Court opinion tars them with the finding that they committed a fraud, thus jeopardizing their right to earn a livelihood. The SEC asserts in its Brief that injunctive relief is merely a "mild prophylactic," which requires "only that a defendant obey provisions of the law that he was already obliged to obey."

 When the SEC brings an injunctive suit to protect the public interest in an open and honest securities market, courts will shape their relief flexibly to effectuate the purposes of the Act. SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); SEC v. Barraco, 438 F.2d 97, 98–99 (10th Cir. 1971). However, before an injunction will issue against a particular party in his personal capacity, it must be shown that he personally is about to commit, is committing, or has committed a securities law offense. The statutory authority of the SEC alone requires such a rule. See § 20(b) of the 1933 Act, 15 U.S.C. § 77t(b), and § 21(e) of the 1934 Act, 15 U.S.C. § 78u(e). In this case, all challenged activities have ended, so that the SEC has not based its request for relief on the assertion that defend-

ants are "about to" commit a violation. Unless Appellants themselves violated the securities laws, there is consequently no basis to enjoin them for fear they will commit "further" violations. See SEC v. National Bankers Life Ins. Co., 324 F. Supp. 189, 197 (N.D.Tex.1971), 334 F. Supp. 444 (D.C.), aff'd, 448 F.2d 652 (5th Cir. 1971).

 We are disturbed by the SEC's tacit suggestion that a Court may personally enjoin a corporate official whenever his company or one of its agents has committed a securities law violation. An injunction is effectively drawn when it enjoins violators and their "agents, servants, employees and those persons in active concert or participation with them who receive actual notice of [an] Order." This is precisely the clause used by the District Court to enjoin all of Appellants' cohorts, in issuing its permanent injunction against Appellants.[10] Furthermore, it is a basic equity principle that "whenever an injunction, whatever its nature may be, is directed to a corporation, it also runs against the corporation's officers," in their corporate capacities. 10 W. Fletcher, Private Corporations § 4875 (1970 ed.). To name individuals personally and to find that they committed a violation they did not commit would be an intolerable abuse of the judicial process. In practical consequence, it would damage the reputations of persons without reason to believe that they personally had violated the securities laws. Cf. SEC v. Frank, 388 F.2d 486, 489 (2d Cir. 1968). Such an arbitrary procedure would also deny named defendants basic constitutional rights in subsequent proceedings, since a personal injunction would be

---

9. District Court Order (S.D. Ohio, filed Dec. 29, 1972).

10. Final Judgment of Permanent Injunction (S.D.Ohio, filed Jan. 24, 1973). We note that the SEC sued Appellant King in his personal capacity in its Colorado suit against King Resources Co. The District Court of Colorado issued an injunction against "King Resources Company, and its officers, directors, agents, employees, assigns and at-

torneys, and those persons in active concert or participation with them." This wording effectively enjoins King in his corporate capacity from participating in violations the Court found had been committed by the Company, without singling him out as having committed a violation. SEC v. King Resources Co., Civil No. C–2858 (D.Colo., filed Feb. 9, 1971). See Rule 65(d), Fed.Rules Civ.Proc.

enforceable through contempt proceedings, even if a future violation were alleged that was based on activity wholly apart from the individuals' corporate relationship.[11] In a contempt proceeding, of course, the defendants would be deprived of the right to defend their actions before a jury. Unless an individual is about to commit, is committing, or has committed a securities law violation, he may not be enjoined in his personal capacity by the SEC. *Cf.* SEC v. International Camra-Corder Corp., CCH Sec. Law Rptr. para. 91,666 (S.D.N.Y. 1966).

The District Court found that Appellants had violated section 17(a)(1) and (3) of the 1933 Securities Act and section 10(b), specifically Rule 10b–5(1) and (3), of the 1934 Securities Exchange Act.[12] In basic terms, these provisions make it illegal to employ a fraudulent scheme or to engage in a deceptive practice in connection with securities sales or purchases. The District Court did not make findings concerning alleged liability under section 17(a)(2) or Rule 10b–5(2), which prohibit false statements and omissions of material fact which would tend to mislead securities purchasers or sellers.

Were it the case that Appellants knowingly used King Resources' "prime" rating on commercial paper as certification of prime quality for their two-year notes (which do not qualify as "commercial paper"), in a misleading manner and without a justifiable excuse, we would have no hesitation in affirming the District Court's conclusions. We must reverse the holding below, however, because no fraudulent or deceptive scheme or practice has been established. We note that in reviewing this case, decided as it was primarily on the basis of depositions and briefs, we are in as good a position as the District Court to review the pleadings, affidavits, and depositions, and to arrive at conclusions of mixed law and fact. Dopp v. Franklin National Bank, 461 F.2d 873, 879 (2d Cir. 1972).

The basic factor which precludes a finding of liability under section 17(a)(1) and (3) and Rule 10b–5(1) and (3) is that King Resources' use, as such, of its prime rating on commercial paper could not have been fraudulent or deceptive. Ohio law required as a precondition for borrowing funds that King Resources show a "prime" rating from NCO on its commercial paper, even

11. The significance of naming an officer or director personally is that "otherwise he is bound only as long as he remains an officer or director, whereas if he is named he is personally enjoined without limit of time." 6 L. Loss, Securities Regulation 4113 (1969, supp. to 2d ed.).

12. Section 17(a) of the 1933 Act, 15 U.S.C. § 77q, provides:
 (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
 (1) to employ any device, scheme, or artifice to defraud, or
 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
 Rule 10b–5, 17 C.F.R. 240.106–5, provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 (1) to employ any device, scheme, or artifice to defraud,
 (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

though a loan being sought from the State of Ohio would extend beyond 270 days, thus taking it outside the category of commercial paper.[13]

Section 135.14, Ohio Rev.Code, limits the entities in which the State Treasurer may invest "interim moneys" of the State to five categories, and limits the term of any obligation to two years. King Resources was eligible to borrow funds only under the following limitation: [14]

"In addition to the investments specified in subparagraphs (A), (B), (C), and (D) of this section, the treasurer of state may invest interim moneys of the state in commercial paper notes issued by any corporation for profit which is incorporated under the laws of the United States, a state, or the District of Columbia, which such notes are rated prime by the National Credit Office, Inc., New York, or its successor, provided that the aggregate total amount of interim moneys invested in commercial paper at any time shall not exceed fifty million dollars."

This section, taken literally, would bar investments of Ohio interim moneys in any corporate notes, outside those specified in paragraphs (A), (B), (C), and (D), which exceed 270 days in duration, since NCO rates companies *only* on their commercial paper, that is, notes of less than a 270-day duration.[15]

Yet, King Resources offered and the State Treasurer bought notes of *two years'* duration. If we assume that the investment was illegal under Ohio law, the error involved was by the Treasurer of the State, not a fraud practiced by King Resources upon the Treasurer. Under such a view of section 135.14, Ohio Rev.Code, both the Treasurer and King Resources knew exactly the terms of the sale,[16] neither being excused from its ignorance of the fact that a two-year note would be improper under Ohio law. We need only conclude that it is not fraudulent to offer a two-year note so long as it is represented as such to determine that King Resources committed no fraud upon the Treasurer if the Treasurer was not authorized to purchase a two-year note.[17]

If, however, we assume that section 135.14 authorizes the purchase of two-year notes from corporations such as King Resources,[18] then we must make sense of the requirement that the notes be rated "prime" by NCO. More than a

---

13. We accept the District Court's conclusion that "commercial paper" is "an unsecured promissory note with a maturity term not exceeding 270 days, the proceeds of which are used for working capital," a definition used by NCO and accepted by Appellants and the securities industry generally. 351 F.Supp. at 252. *See* Handal, "The Commercial Paper Market and the Securities Acts," 39 U.Chi.L.Rev. 362, 363–64 (1972).

14. There has been no allegation by any party that the investment was sanctioned by other provisions of Ohio law, though section 135.-14 may not be an exclusive authorization, since it only applies to the investment of "interim" moneys. Thus, we cannot reach the conclusion of the District Court which considered a similar loan, to a co-defendant in the instant case, to be outside the purview of § 135.14. *See* In re Four Seasons Nursing Centers of America, Inc., 329 F. Supp. 647, 651 (W.D.Okl.1971).

15. See n. 13, *supra*.

16. This is the apparent basis of the District Court's holding in In re Four Seasons Nursing Centers of America, Inc., 329 F.Supp. at 651–52.

17. The Treasurer of the State of Ohio has an obligation to determine whether its investments accord with state law and, specifically, whether an item of commercial paper offered for sale has been rated prime by NCO. *See* Ohio Op. Att'y Gen. No. 70–067 (1970). We cannot describe the Treasurer's failure to fulfill this elementary duty as a fraud practiced upon it by a securities offeror.

18. Such an interpretation would require a finding that the Ohio legislature intended "commercial paper" to encompass notes of a duration more than twice that of the currently established definition, or that it intended to authorize NCO to determine the legal definition of commercial paper under Ohio law. Ohio Attorney General Opinion No. 70–067, *supra*, n. 17, adopts the latter view.

month after the Treasurer bought the King Resources notes, the Ohio Attorney General advised the Treasurer that a two-year note would be a proper investment if it were rated "prime commercial paper" by NCO.[19]

The difficulty which this Opinion poses stems from a latent defect in section 135.14, which authorizes investments only in commercial paper rated "prime" by NCO. In fact, NCO does not rate notes. It only rates companies. If a company can show that it meets the criteria for a "prime" rating on commercial paper it might issue,[20] NCO rates the company "prime" for the commercial paper market. Only by implication may a particular note be considered to have a "prime" rating, since NCO does not rate individual issues of notes.

Thus, a company seeking funds from the State of Ohio is forced to proceed by submitting to the State a proposal of a note not exceeding two years in duration, coupled with a showing that the company itself is rated "prime" on its commercial paper by NCO. This is the only manner in which a company can establish its eligibility for an Ohio loan under § 135.14, Ohio Rev.Code, since NCO only rates companies on their commercial paper (notes of less than 270-day duration). It does not provide ratings which are necessarily valid in evaluating the quality of two-year notes.[21]

 Under these circumstances, we cannot characterize a company's use of NCO's "prime" rating on its commercial paper in seeking to sell two-year notes to the State of Ohio as a fraudulent scheme or a deceptive practice. King Resources' use of its "prime" rating was mandated by state law as a pre-condition to selling its notes to the State, so that the State cannot, as a matter of law,

have been defrauded by such use. Fraud or deceit presupposes the superior knowledge of one party over another. *See* Myzel v. Fields, 386 F.2d 718, 739 (8th Cir.), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). The State was not in the position of an innocent purchaser, misled by an insider's use of a prime rating on short-term paper to justify the quality of its longer term notes, since the State itself required precisely the showing it received. A section 17(a)(1) and (3) or Rule 10b–5(1) and (3) violation depends on one party's taking unfair advantage of another party through a deceptive practice or fraudulent scheme. There is no duty to disclose information to one who reasonably should already be aware of it. Kohler v. Kohler Co., 319 F.2d 634, 642 (7th Cir. 1963); Arber v. Essex Wire Corp., 490 F.2d 414 at 420 (6th Cir. 1974). Since both King Resources and the State are held to the knowledge that NCO's rating on commercial paper did not apply to two-year notes, it follows that no violation of these sections of the securities laws could have occurred.

The District Court's finding of Appellants' liability under section 17(a)(1) and (3) and section 10(b), specifically Rule 10b–5(1) and (3), therefore, is erroneous as a matter of law and must be reversed.

The District Court made no findings as to liability under section 17(a)(2) and Rule 10b–5(2), though much evidence was presented on this point. The SEC presented its entire case below and makes no claim that other evidence would be presented should we remand for findings under section 17(a)(2) and Rule 10b–5(2). On the record in this case, we conclude that a remand would

19. *Id.*

20. The criteria include such factors as liquidity position, bank credit line, net worth, and track record. *See* Handal, *supra*, n. 13, at 371–73.

21. A "prime" rating on commercial paper means that the rated company will most as-

suredly be able to pay off the short-term note through the proceeds of a product cycle which is financed by the short-term loan. A rating on a two-year loan would depend on quite different factors, such as the long-term viability of the enterprise and longer-range forecasts of business conditions.

be inappropriate in the case of John King, though the SEC should have the chance to show that William Coffey is liable under these provisions.

Section 17(a)(2) and Rule 10b–5(2) are directed against false statements and omissions of material fact in connection with securities sales and purchases. In the instant case King Resources' agents may have omitted material facts both in obtaining a prime rating from NCO and in negotiating with the State of Ohio. The alleged omissions in obtaining NCO's prime rating are that King Resources was planning to sell two-year (non-commercial) notes to Ohio, that the company was not meeting creditor obligations, and that it was planning to impair its ability to repay short-term loans by reloaning part of its borrowed funds. The alleged omissions in negotiating with the State of Ohio are that King Resources' "prime" NCO rating did not apply to the two-year notes, that King Resources was not meeting obligations maturing at the time of sale, and that King Resources planned to reloan a substantial part of the proceeds of the Ohio borrowings.

As to Appellant Coffey, who personally sent financial information to NCO, a potential finding under Rule 10b–5(2) is that he omitted material facts necessary to make the statements made to NCO not misleading.[22] If the SEC can prove that the alleged omissions represent facts which were known or should have been known by Coffey while dealing with NCO, that they were necessary to make the information forwarded to NCO not misleading, and that Coffey knew or should have known that the omitted information was significant to NCO within the principles of SEC v. Capital Gains Bureau, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), then Coffey may have violated Rule 10b–5(2).

In addition to these factors, however, it is essential that the SEC show that Coffey's inaction was in "wilful or reckless disregard for the truth." The Second Circuit, sitting *en banc*, recently established this standard in regard to private damage actions in similar situations. Lanza v. Drexel & Co., 479 F.2d 1277, 1306 (2d Cir. 1973). *Cf.* Mader v. Armel, 461 F.2d 1123 (6th Cir.), cert. denied, 409 U.S. 1023, 93 S.Ct. 465, 34 L. Ed.2d 315 (1972). Although *Lanza* involved private plaintiffs, and the standards of culpability may be lower in SEC injunctive suits than in private damage actions, SEC v. Capital Gains Bureau, *supra*, the reasoning of the Second Circuit in *Lanza* fully supports our conclusion that the SEC's proof in an injunctive suit must meet the standard of showing "wilful or reckless disregard for the truth."

Although the allegations in this case may make Coffey a direct participant in a Rule 10b–5(2) violation in his dealings with NCO, a different question arises as to Appellant King's relationship to the Ohio and NCO contacts and as to Appellant Coffey's relationship to the Ohio negotiations. In these three instances Appellants had no direct contact with the allegedly misled parties. The record shows that as Chairman of the Board, King attended both Executive Committee meetings where the Ohio loans were authorized. Between these meetings King met with Defendants Groban and Griffiths (of Crofters, Inc.) to discuss additional funds, with no evidence of discussion of Groban's representations to NCO or the State of Ohio. Coffey's involvements in the Ohio loan negotiations were his participation in the meetings which approved the two Ohio loans, his signature on the notes, and his general oversight of King Resources' financial affairs as its financial vice-president.

---

**22.** Since NCO was not buying a security, liability cannot rest under section 17(a). Rule 10b–5, however, posits liability for deceptive practices "in connection with" a security sale. Since the NCO prime rating was an essential ingredient of the Ohio sale, there is a direct connection between obtaining the prime rating from NCO and the Ohio loan, and Rule 10b–5 comes into play.

In considering whether King's alleged involvement in either NCO or Ohio dealings (and Coffey's as to the Ohio negotiations) violated section 17(a)(2) or Rule 10b–5(2), we start by noting the three categories of liability for which a person may be enjoined under the securities laws.[23] First, a person may have directly participated in the deceit, endowing him or her with primary liability for the violation. Second, he or she may have knowingly assisted the commission of a violation by another party, making him or her secondarily liable for the violation. Third, a party may have been a "controlling person" of another who is liable for a securities law violation, so as to be liable under section 20 of the Securities Exchange Act of 1934.

We cannot find any evidence to support the contention that King was a primary participant in the alleged deception on NCO or the State of Ohio or that Coffey was a direct participant in the Ohio negotiations. Neither King nor Coffey had any contact with the officials negotiating for the State of Ohio, and King had no contact with NCO officials. Since in this case liability under section 17(a)(2) and Rule 10b–5(2) depends on proof of a deceptive omission in the context of deliberations with NCO or Ohio officials, only those individuals who had an affirmative obligation to reveal what was allegedly omitted can be held as primary participants in the alleged deception. A duty to disclose naturally devolved on those who had direct contacts with "the other side." [24] In the case of King and Coffey as to the Ohio officials and King as to NCO, we would have to imply a duty to contact the allegedly deceived officials and to disclose the allegedly omitted facts.

Here the duty which we would have to posit to find primary liability is the duty of a corporate board chairman and financial vice-president carefully to supervise the activities of a money-finder in its negotiations with a State Treasurer's Office, and in the NCO case, a corporate board chairman's duty to monitor his financial vice-president's dealings with a credit-rating agency. Imposing such a duty would effectively make corporate officials primarily liable for any securities law violation by a subordinate. It would disrupt corporate systems of delegation of authority and accountability and would, *sub silentio*, repeal the protections contained in the "controlling persons" provision, section 20 of the 1934 Act. We refuse to impose such a duty.[25] Our refusal is in accordance with other decisions which have declined to impose duties on persons not in a special relationship with a buyer or seller of securities. SEC v. Great American Industries, Inc., 407 F.2d 453, 460 (2d Cir. 1968) (*en banc*); Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. 1973) (*en banc*); Mader v. Armel, 461 F.2d 1123 (6th Cir. 1972).

The second category under which Appellants might be held is that of secondary liability. This is the category in which the District Court seems to have placed Appellants, since it held King liable as a "responsible officer" of King

---

23. *See generally* Ruder, "Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution," 120 U.Pa. L.Rev. 597 (1972); A. Bromberg, Securities Law Fraud, § 8.5 (515–583), 208.5–.46 (1971).

24. Direct contacts may take many forms. An accountant or lawyer, for instance, who prepares a dishonest statement is a primary participant in a violation even though someone else may conduct the personal negotiations with a securities purchaser. *See* H. L. Green Co. v. Childree, 185 F.Supp. 95 (S.D. N.Y.1960); Fischer v. Kletz, 266 F.Supp. 180, 189–194 (S.D.N.Y.1967); SEC v. Spectrum, Ltd., 489 F.2d 535 (2d Cir. 1973); Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

25. Thus, we need not reach the thorny general question whether some form of *scienter* must be shown as a prerequisite to imposing liability or whether mere negligence or misrepresentation suffices to establish a violation.

Resources and described Coffey as an "aider and abettor.".[26]

Secondary liability is imposed under concepts borrowed from the common and the criminal law—"aiding and abetting" and conspiracy.[27] We are aware of no other standard of secondary liability in securities law, aside from the "controlling persons" provision of section 20 of the 1934 Act (treated herein as a separate category).

■ A detailed discussion of conspiracy is unnecessary here, since no evidence of conspiracy existed. An essential element of conspiracy is an agreement to accomplish a wrongful purpose.[28] Here the wrongful purpose would have been to omit material facts in dealing with NCO and Ohio officials. Casting Appellants' inaction into a conspiracy with Crofters' personnel to accomplish this purpose would stretch the usefulness of the conspiracy concept far beyond its proper elasticity.

■ Appellants' actions are better analyzed under the aiding and abetting rationale. Aiding and abetting has been defined by courts considering securities law cases with reference to both the Re-

statement of Torts, § 876 (1939), and the criminal law, 18 U.S.C. § 2 (1969).[29] Without meaning to set forth an inflexible definition of aiding and abetting, we find that a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.[30]

■ In this regard, we note that Coffey testified that he discussed the terms of the Ohio loan with Groban of Crofters, Inc. Should the District Court find that through this contact Coffey became aware that Crofters' personnel were misleading the State of Ohio, his knowledge that a violation was occurring would be established and his failure to take remedial action would be a form of aiding and abetting.

■ We find no evidence, however, that King knew that the personnel of Crofters, who conducted the actual negotiations with the State of Ohio, were misleading the State as to the terms of the loan, the meaning of the NCO prime

26. *See* nn. 8, 9, *supra.*

27. *See· generally* Ruder, *supra,* n. 23, at 620–46. It is also imposed upon corporations whose agents commit violations, under the traditional concept of *respondeat superior. See, e.g.,* Johns Hopkins Univ. v. Hutton, 297 F.Supp. 1165 (D.Md.1968), aff'd in part, rev'd in part and remanded, 422 F.2d 1124 (4th Cir. 1970).

28. Dasho v. Susquehanna Corp., 380 F.2d 262, 264, 267, n. 2 (7th Cir.), cert. denied sub nom. Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967).
*See* Ruder, *supra,* n. 23, at 627, 631, 639. Prof. Bromberg describes a conspiracy in a securities law context as entailing "actions in different areas of responsibility of relatively equal importance." A. Bromberg, Securities Law: Fraud, § 8.5(515), 208.6 (1971).

29. *See* Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673, 680 (N.D.Ind. 1966), 286 F.Supp. 702 (N.D.Ind.1968), aff'd, 417 F.2d 147 (7th Cir. 1969); A. Bromberg, Securities Law: Fraud, § 8.5 (530), 208.20 (1971).

30. *See* SEC v. Timetrust, Inc., 142 F.2d 744, 746 (9th Cir. 1944); Fischer v. Kletz, 266 F.Supp. 180, 197 (S.D.N.Y.1967); *Brennan, supra*; Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 970 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949); Ruder, *supra,* n. 23, at 626–38, 641–44; A. Bromberg, Securities Law: Fraud § 8.5(582), 208.45 (1971).
We view the Second Circuit's decision in SEC v. Spectrum Ltd., 489 F.2d 535 (2d Cir. 1973), as correct on its facts. There a lawyer was aware that his misleading opinion letter could be used to sell unregistered securities and failed to take timely steps to prevent such use. We do not believe that this application of a negligence standard to that situation compels us to apply a negligence standard in the very different case we confront. Here, there must be some showing that Appellants were aware of the Crofters' personnel's alleged misrepresentations. We note further that the attorney in *Spectrum, Ltd.* had committed three prior securities law violations, so that his argument of innocent knowledge was subject to doubt.

rating, or King Resources' financial condition. Nor do we find any evidence that King knowingly assisted any deception which Crofters' personnel may have perpetrated on State officials. Inaction may be a form of assistance in certain cases, but only where it is shown that the silence of the accused aider and abettor was consciously intended to aid the securities law violation.[31] SEC v. Timetrust, Inc., 142 F.2d 744, 745 (9th Cir. 1944); Brennan v. Midwestern United Life Ins. Co., 417 F.2d 147, 154–155 (7th Cir. 1969) cert. denied, 397 U. S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970); Fischer v. Kletz, 266 F.Supp. 180, 195 (S.D.N.Y.1967) (inaction claim dismissed as to financial statements accountants did not prepare); Wessel v. Buhler, 437 F.2d 279, 283 (9th Cir. 1971); SEC v. National Bankers Life Ins. Co., 324 F.Supp. 189, 195 (N.D. Tex.), 334 F.Supp. 444 (D.C.), aff'd, 448 F.2d 652 (5th Cir. 1971).

▉ Normally, intent to commit a securities law violation does not require independent proof. Texas Continental Life Ins. Co. v. Dunne, 307 F.2d 242, 249 (6th Cir. 1962); SEC v. Capital Gains Bureau, 375 U.S. 180, 193, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Knowledge that a securities law violation would be furthered by one's silence or inaction, however, must be proven by reliable and probative evidence, Pettit v. American Stock Exchange, 217 F.Supp. 21, 28 (S.D.N.Y.1963); SEC v. National

Bankers Life Ins. Co., 324 F.Supp. 189, 195 (N.D.Tex), aff'd per curiam, 448 F. 2d 652 (5th Cir. 1971), final judgment entered, 334 F.Supp. 444, 456 (N.D.Tex. 1971), aff'd, 477 F.2d 920 (5th Cir. 1973), though the evidence may be circumstantial as well as "direct." SEC v. National Bankers Life Ins. Co., *supra*. Were such proof not required, a person who is not primarily liable for a violation could yet be held personally liable for the violation, even though he or she was unaware of the need to disclose information withheld by those primarily liable. The result would be to impose liability for an innocent omission, for non-culpable inaction.[32] This would stretch the application of Rule 10b–5 beyond its statutory limits, since section 10b of the 1934 Act does not impose liability for innocent acts but only for acts of fraud or deceit.[33]

The same analysis leads to the conclusion that King could not be considered an aider and abettor to an alleged Rule 10b–5(2) violation committed in King Resources' dealings with NCO. There is no evidence that King was personally aware of any omissions of material fact by Crofters' personnel and Coffey in their dealings with NCO, and there is no indication that he had reason to suspect that a misrepresentation might be made. As we have pointed out above, he need not have doubted the propriety of seeking a "prime" rating, since King Resources needed it to place notes with the

31. *See* Ruder, *supra*, n. 23, at 641–44, note, "Accountants' Liability for False and Misleading Financial Statements," 67 Colum.L. Rev. 1437, 1447–50 (1967).

32. In Fry v. Schumaker, 83 F.Supp. 476 (E. D.Pa.1947), for example, the Court held that a broker could be held liable for providing assistance to others only if he "knew" that doing so served essentially the fraudulent scheme.

33. Section 10(b) of the Exchange Act of 1934 provides as follows:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

For a discussion of Rule 10b–5's non-application to non-culpable conduct, *see* Note, "Corporations—Rule 10b–5—Nonparticipating Corporate Director Owes No Duty to Insure that all Material, Adverse Information is Conveyed to Prospective Purchasers," 5 St. Mary's L.J. 382, 387 (1967).

State of Ohio and to sell other commercial paper being prepared for sale in May 1970.[34]

The third category of possible liability is contained in section 20 of the 1934 Securities Exchange Act. Section 20 provides:

(a) Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

(b) It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this title or any rule or regulation thereunder through or by means of any other person. 15 U.S.C. § 78t.

The District Court did not specifically anchor its finding of liability on this section. Yet, its reference to King as the "responsible officer" of King Resources suggests that this section might have been the source of its holding.

The Commission asserts that King was a controlling person within section 20(a) of the 1934 Act and that it may be inferred from the District Court's holding that he failed to establish a "good faith" defense, since the District Court ruled against King.

We cannot assume that the District Court used section 20(a) to hold King liable. Whether a person "controls" another under section 20(a) is a complex factual question. Klapmeier v. Telecheck International, Inc., 315 F.Supp. 1360 (D.Minn.1970). *But cf.* Myzel v. Fields, 386 F.2d 718, 738 (8th Cir. 1967). There is no indication that the District Court made a factual finding to that effect or gave notice to King that he should establish a defense against such a finding.

Even had proper findings been made, however, we hold that section 20(a) of the 1934 Act may not be relied upon by the SEC in an injunctive enforcement action. Section 20(b) of the 1934 Act provides for the *unlawful* actions of controlling persons, and the SEC may only seek injunctions against unlawful actions. *See* section 20(b) of the 1933 Act, 15 U.S.C. § 77t(b); section 21(e) of the 1934 Act, 15 U.S.C. § 78u(e). Section 20(a) of the 1934 Act makes a controlling person liable "to any person to whom such controlled person is liable." As a matter of legislative interpretation, we hold that the SEC is not a person under section 20(a), since section 20(a) was meant to specify the liability of controlling persons to private persons suing to vindicate their interests. Section 20(b) sets forth the standard of lawfulness to which a controlling person must conform, on penalty of liability in injunction to the SEC or criminal prosecution.

Under section 20(b), there must be shown to have been knowing use of a controlled person by a controlling person before a controlling person comes within its ambit. Without such a restriction, every link in a chain of command would be personally criminally and civilly liable for the violations of inferior corporate agents. This was not the congressional intent in enacting section 20(b). As we concluded above, King has not been shown to have had any knowledge of Crofters' personnel's dealings with either the State of Ohio or NCO, nor can we find a scintilla of proof that he "used," directly or indirectly, Crofters' personnel to carry out a violation.

We conclude that on the record as a whole King could not be held liable as a participant, as a secondary party, or as a controlling person for any possible section 17(a)(2) or Rule 10b–5(2) viola-

---

34. King Resources had scheduled an issue of commercial paper through an established underwriter for May 1970.

tions of King Resources' agents. Thus, the case must be dismissed as to him.

As to Coffey, we find the allegations of his role in obtaining a "prime" rating from NCO sufficient to warrant a hearing on Rule 10b–5(2) liability as a primary participant in omitting material facts in a misleading way. Further, we find that Coffey may be held liable as an aider and abettor under Rule 10b–5(2) if it should be proved that he was aware that actionable fraud was being perpetrated on State of Ohio officials and that he failed to take available remedial action.

Reversed and remanded for proceedings consistent with this Opinion.