SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,

v.

Alvin DOLNICK, Defendant-Appellant.

No. 73–1752.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1974.

Decided Aug. 16, 1974.

M. David Hyman, New York City, Alex H. Dolnick, Chicago, Ill., for defendant-appellant.

Walter North, Associate Gen. Counsel, Jacob H. Stillman, Asst. Gen. Counsel, Securities and Exchange Commission, Washington, D. C., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This enforcement action was brought against Alvin H. Dolnick and 18 others by the Securities and Exchange Commission pursuant to Section 20(b) of the Securities Act of 1933 (15 U.S.C. § 77t(b)) and Section 21(e) of the Securities Exchange Act of 1934 (15 U.S.C. § 78u(e)). Dolnick is a securities salesman in the Chicago office of a nationally known brokerage firm. Through default and consent judgments, all defend-

ants except Dolnick and one George Dixon were enjoined from violating various provisions of the federal securities laws. The trial proceeded against Dolnick and Dixon, resulting in a somewhat similar permanent injunction against them. Dixon's appeal has been dismissed for lack of prosecution, so that we are concerned only with the SEC's case against Dolnick.

At the conclusion of the trial, the district court rendered findings of fact and conclusions of law adverse to Dolnick and Dixon. Insofar as Dolnick is concerned, the district court found that in November 1968 he became a shareholder of King Kastle Systems, Inc., a Delaware corporation controlled by Paul Pickle, a convicted felon.

About the same time, Congress-Pacific Corporation, a Nevada corporation also controlled by Pickle, acquired 80% of the common stock of Pig'N Whistle Corporation for 6¢ per share, thus enabling Pickle to control Pig'N Whistle as well. King Kastle was acquired by Pig'N Whistle in June 1969. From November 1968 to December 1969, Pig'N Whistle sold and distributed 2,000,000 shares of common stock and 599 convertible debentures to the public.

Dolnick and others were found to have participated in the distribution of unregistered Pig'N Whistle securities from November 1968 to June 1970 by mailing the common stock and convertible debentures and selling such securities through prospectuses and otherwise. According to the findings, Dolnick knew that the Pig'N Whistle shares that he pledged to banks from May 1969 to January 1970 were neither registered nor exempt from registration.

Dolnick, in offering and selling such securities of Pig'N Whistle from November 1968 to June 1970, was found to have employed a scheme to defraud and to have obtained money and property by untrue statements of material facts and by omissions to state material facts and to have engaged in transactions that op-

erated as a fraud and deceit upon purchasers of such securities.

In particular, Dolnick was found to have made untrue statements of material facts and to have omitted statements of material facts concerning the following:

"a) the lack of registration of Pig'N Whistle common stock and convertible debentures;

b) the non-marketability of said securities;

c) Paul Pickle who dominated and controlled Pig'N Whistle Corporation;

d) the operating losses and deficit net worth of Pig'N Whistle Corporation;

e) the price for the proposed registered offering of Pig'N Whistle common stock;

f) the details concerning the King Kastle buy-back letter."

The court concluded that a pledge of securities for value (such as Dolnick made to two banks) is a sale as defined in Section 2(3) of the Securities Act of 1933 (15 U.S.C. § 77b(3)) and that Dolnick was an underwriter as defined in Section 2(11) of that Act (15 U.S.C. § 77b(11)). The court also concluded that he had violated Sections 5(a) and (c) and 17(a) of the Securities Act (15 U.S.C. § 77e(a) and (c) and 77q(a)), Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b) and Rule 10b–5 thereunder (17 C.F.R. 240.10b–5). Accordingly, he was permanently enjoined from selling non-exempt securities of any issuer not covered by an effective registration statement accompanied by or preceded by a proper prospectus. He was also enjoined from violating the anti-fraud provisions of Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act and Rule 10b–5 thereunder. While appealing from the entire decree, Dolnick is particularly concerned with the anti-fraud aspects thereof. Because the facts were not fully disclosed in the findings of the district court, of necessity they will have

to be discussed in connection with the various violations found.

### Violation of Registration Provisions of Securities Act by Sale of Stock Received Through Pig'N Whistle Acquisition of King Kastle

█ Dolnick pledged as collateral for bank loans thousands of unregistered shares of Pig'N Whistle common stock he received in connection with its acquisition of King Kastle. Those loans could be repaid only through the unregistered distribution of the pledged shares to the public. He subsequently sold over-the-counter some of those shares as released by the banks to reduce the loan balances with the proceeds of the sales. Under Section 2(3) of the Securities Act (15 U.S.C. § 77b(3)), the pledging of the stock was within the statutory definition of "sale," which includes "every * * * disposition of * * * [an] interest in a security, for value." Section 4 of the Act (15 U.S.C. § 77d) does not exempt these pledges and subsequent sales because Dolnick was participating as a statutory underwriter.[1]

█ In defense Dolnick claims that he was not an underwriter. His only argument in support of this contention is that his exchange of King Kastle stock for Pig'N Whistle stock was a "no sale" transaction under former SEC Rule 133 (17 C.F.R. 230.133 (1972)), so that he had not purchased the stock within the underwriter definition. Rule 133 exempted statutory mergers in which all stockholders were bound, subject to appraisal rights, by the decisions of a specified majority. The acquisition of King Kastle by Pig'N Whistle was a stock-for-stock exchange offer made to King Kastle shareholders, resulting in King Kastle's becoming a corporate subsidiary of Pig'N Whistle. In such circumstances, the terms of Rule 133 do not apply. See generally I Loss, Securities Regulation, 518 et seq. (2d ed. 1961).

### Violation of Registration Provisions of Securities Act by Sale of Pig'N Whistle Stock Received on Conversion of its Debentures

In February or March 1970, Dolnick sold over-the-counter 500 shares of unregistered Pig'N Whistle stock which he had acquired through conversion of Pig'N Whistle convertible debentures that he had purchased from Pig'N Whistle. The court below held that in this respect also he was an underwriter whose sales were in violation of the registration provisions of the Securities Act.

█ Registration is required for transactions which involve distribution of issues to the public. Section 5 of the Securities Act (15 U.S.C. § 77e). As noted, the term "underwriter" was broadly defined in Section 2(11) to include intermediaries such as Dolnick, and the exemptions provided in Section 4 (15 U.S.C. § 77d) do not fit his case. A sale of these 500 shares in the over-the-counter market by the issuer would have constituted a "public offering" within Section 4(2). This is so because whether an offering is public does not depend on how many shares are offered, but on whether the buyer has need for the protections of the Act. SEC v. Ralston-Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494. By the same token, the sale of these shares by an intermediary like Dolnick was a "distribution" within Section 2(11). Gilligan, Will & Co. v. SEC, 267 F.2d 461, 466 (2d Cir. 1959), certiorari denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152.

### Violation of Registration Provisions of Securities Act by Participating in Offer and Sale of Pig'N Whistle Debentures

█ In May or June 1969, Dolnick arranged for two friends and his brother to attend a Pig'N Whistle meeting

---

1. In Section 2(11) of the Act (15 U.S.C. § 77b(11)), an underwriter is broadly defined to include "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking * * *."

for the purpose of having them purchase Pig'N Whistle debentures. This meeting was held and resulted in the investment in such securities by all three. There is no evidence as to what Dolnick said on the way to or at the meeting, but the district judge could properly infer from Dolnick's involvement with Pig'N Whistle and his underwriter status that he did more than serve as chauffeur. He was at least an aider and abetter in the scheme to sell unregistered debentures. He is therefore accountable. Brennan v. Midwestern United Life Insurance Co., 417 F.2d 147, 151–154 (7th Cir. 1969), certiorari denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L. Ed.2d 397.

*Violation of Anti-Fraud Provisions of Securities and Securities Exchange Acts in Connection with Pledges of Stock Made to Secure Bank Loans*

The district court found that Dolnick falsely represented to the Devon Bank and the Bank of Ravenswood that the pledged Pig'N Whistle stock was freely marketable and also misrepresented to the Devon Bank the terms of a buy-out letter with regard to his King Kastle stock. The only defense tendered to the first misrepresentation was the applicability of Rule 133, but we have already held that it does not apply.

■ The buy-out letter pertained to Dolnick's King Kastle stock, which was pledged at the same time as 3,800 shares of Pig'N Whistle to secure a loan of $50,000 from the Devon Bank. Since the false statements regarding the King Kastle stock were made in connection with the pledges of the stock of both corporations in a single transaction, they were in connection with the sale of Pig'N Whistle stock and therefore part of the violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U. S.C. § 78j(b)) alleged in the complaint.

■ Although the Devon Bank insisted on the buy-out letter from King Kastle promising to buy the stock at a certain price, Dolnick refrained from disclosing to the bank King Kastle's covering letter

indicating that its financial position and capabilities caused it to hope it would not have to meet the buy-out obligation. The text of the cover letter was received in evidence by stipulation and therefore could be relied upon by the SEC to show that material information had been withheld by Dolnick. The letter was material without regard to the truth of the matters stated or implied; the loan officer testified that he did not believe he would have made the loan if he had seen the cover letter.

*Violation of Anti-Fraud Provisions of Securities Exchange Acts in Connection with Sales of Pig'N Whistle Stock to Joel Chernoff*

■ We have reviewed the evidence and are satisfied therefrom that the district judge could properly find that Dolnick made various misrepresentations to his customer, Joel Chernoff, with respect to the financial condition of Pig'N Whistle and the background of its "general manager," Paul Pickle. According to testimony of record, Dolnick also failed to disclose to Chernoff deleterious information about the corporation. When Pig'N Whistle's subsequently withdrawn registration statement was filed in December 1969, Dolnick told Chernoff that a public offering would be made at a price three times the then trading level of the stock, which, he predicted, would quickly rise to the higher level. Such statements bear the hallmarks of fraud. It is of course immaterial that Chernoff might have been a knowledgeable investor. Carroll v. First National Bank of Lincolnwood, 413 F.2d 353, 357 (7th Cir. 1969), certiorari denied, 396 U.S. 1003, 90 S.Ct. 552, 24 L. Ed.2d 494; Hanly v. SEC, 415 F.2d 589, 596 (2d Cir. 1969). Furthermore, Dolnick's false statements and omissions were "in connection with" the purchase or sale of a security for purposes of Section 10(b) of the Securities Exchange Act and Rule 10b–5, even though they were not made during solicitations of Chernoff to purchase the stock. Cf. SEC v. Texas Gulf Sulphur Co., 401 F. 2d 833, 860 (2d Cir. 1968) (en banc),

certiorari denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L. Ed.2d 756; Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 239 (2d Cir. 1974). Finally, the trier of facts was entitled to credit Chernoff's testimony that Dolnick had recommended Chernoff's investments in Pig'N Whistle stock despite the "no-solicitation" letters Dolnick obtained from Chernoff.

SEC v. Coffey, 493 F.2d 1304 (6th Cir. 1974), does not support Dolnick. There the court held that the SEC must show that a defendant spoke with "wilful or reckless disregard for the truth" (493 F.2d at 1315). That standard is probably met here, but we need not pass on that issue for *Coffey* is inconsistent with the law of this Circuit. SEC v. Van Horn, 371 F.2d 181 (7th Cir. 1966); Swanson v. American Consumer Industries, Inc., 475 F.2d 516, 525 (7th Cir. 1973). "It is no defense to an action for an injunction * * * that the admittedly false statements were uttered without knowledge or that there was no intention to omit the disclosure of material facts." *Van Horn* 371 F.2d at 186.

Judgment affirmed.